80 A.3d 269

**William H. MATHEWS**

v.

**CASSIDY TURLEY MARYLAND, INC. et al.**

**No. 51, Sept. Term, 2012.**

Court of Appeals of Maryland.

Nov. 26, 2013.

---

586

588

Thomas C. Costello (Costello Law Group, Towson, MD), on brief, for appellant/cross-appellee.

Matthew S. Sturtz (Jeffrey P. Reilly of Miles & Stockbridge P.C., Towson, MD), on brief, for appellee/cross-appellants.

Douglas F. Gansler, Esq., Atty. Gen. of Maryland, T. Webster Brenner, Esq., Katharine M. Weiskittel, Esq., Asst. Attys. Gen., Baltimore, MD, Joseph J. Opron, III, Esq., North American Securities Administrators Association, Inc., Washington, DC, for amici curiae brief of Maryland Securities Commissioner and North American Securities Administrators Association, Inc. in support of appellant/cross-appellee.

Argued before: BARBERA, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, McDONALD, BELL *, JJ.

McDONALD, J.

It is sometimes the case that an individual bent on avoiding taxes exchanges the certainty of the tax liability for a risky, and perhaps fraudulent, investment that proves more costly in the long run. The instant litigation arises out of such a situation. We are asked to decide the nature of the investment—was it a "security" for purposes of application of the Maryland Securities Act?—and whether the long run was too long—are the claims barred by limitations? We also consider the potential use at trial of a bankruptcy examiner's report concerning the promoter of the investment scheme.

We hold that an investment that combined a tenant-in-common interest in commercial real estate with a mandatory management contract with the affiliate of the seller and only a limited ability for the buyers to effect a change of management of the property is an "investment contract" and therefore a security for purposes of the Maryland Securities Act. We affirm the Circuit Court's determination that the buyer's claims under the Securities Act are barred by limitations insofar as they relate to registration under the Act. We reverse the court's determination that the buyer's claims under the Act that relate to alleged fraud and misrepresentation by the defendants are barred by limitations and remand for further consideration whether the limitations period as to those claims was tolled by affirmative fraudulent conduct of the defendants. For a similar reason, we also reverse and remand for reconsideration the Circuit Court's judgment that the buyer's common law tort claims are time-barred as a matter of law. We decline to affirm the award of summary

---

* Bell, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

judgment on an alternative ground that the Circuit Court did not adopt. Finally, we affirm the Circuit Court's decision to reserve judgment on the admissibility and use of a bankruptcy examiner's report until it had additional information concerning the proposed use of the report in the context of the trial.

## Background

### *Factual Background*

Except as otherwise indicated below, the following facts are undisputed in the record of this case, although the parties have some differences as to immaterial details and as to the inferences that may be drawn from these facts.

### *Mr. Mathews Seeks an Investment*

In 2003, Petitioner William H. Mathews, a retired school teacher and librarian, had owned and managed his rental properties for more than 40 years. At that time, he owned eleven rental properties near the campus of Towson University; he rented those properties primarily to students and faculty at the university. In response to anticipated deleterious changes in local zoning laws, Mr. Mathews decided to sell the properties. Ultimately, he was referred to Stephen Weiss, a real estate professional. Mr. Weiss was then employed by W.C. Pinkard & Co., the predecessor in interest to Respondent Cassidy Turley Maryland, Inc. ("Cassidy Turley").[1] Mr. Mathews retained Cassidy Turley to market the properties, and in August 2004 the properties were sold to Bob Ward Companies for approximately $4 million. Mr. Mathews paid approximately $176,000 to Cassidy Turley as a commission.

In order to receive more favorable tax treatment of the proceeds of the sale, Mr. Mathews sought to re-invest the proceeds in other real estate shortly after the sale. With Mr. Weiss' advice, Mr. Mathews ultimately used much of the proceeds to purchase five fractional interests in various com-

---

1. For simplicity we use "Cassidy Turley" to refer to both W.C. Pinkard and Cassidy Turley, as well as related entities.

mercial office buildings located throughout the United States.[2] These fractional interests were called "Tenants in Common Interests" ("TICs"). Mr. Weiss provided Mr. Mathews with binders containing various documents that described the particular TICs under consideration.

*TICs*

Each of the TICs in question was created by a company called DBSI, Inc., located near Boise, Idaho, or an affiliated company. The structure of the TICs are set forth in various written agreements and other materials. DBSI would purchase real estate, typically an office building, and divide it into TICs that it would then sell to investors. Investors in the TICs were required, as a condition of the purchase, to agree to retain DBSI[3] as property manager,[4] in return for which DBSI promised a specified annual rate of return on the investment. DBSI would locate sub-tenants who would occupy the property and pay the rent that produced a revenue stream. Under the property management agreement, replacement of DBSI as property manager required a majority vote of all TIC owners of a given piece of property, as well as

---

**2.** In particular, Mr. Mathews used $2.3 million of the net proceeds to purchase interests in five office buildings for prices ranging from $400,000 to $545,000. Unrelated to these transactions or Mr. Weiss, he also paid $525,000 of the proceeds to purchase a property in White Hall, Maryland. Mr. Mathews understood that each of the properties apparently qualified as a "like-kind exchange property" for purposes of § 1031 of the Internal Revenue Code, 26 U.S.C. § 1031, and that the transactions thus permitted him to defer payment of capital gains taxes on the sale of those rental properties. The TICs were among several options that Mr. Weiss had presented to Mr. Mathews as "1031 exchange properties."

**3.** The provision referred to an affiliate of DBSI. For simplicity, we use "DBSI" to include all related entities.

**4.** This arrangement was created through a "NNN Plus Lease Agreement" or "Master Lease Agreement" under which the investors leased the property to the DBSI affiliate, which would sublease the property; the investors would receive the pre-arranged set return in the form of "rent" paid by the affiliate, which would recover its management fee from revenues generated by the properties in excess of the promised rent that the affiliate paid the TIC investors.

indemnification of DBSI against any and all claims, actions, costs, damages, liabilities, deficiencies or expenses relating to the property. In the event that DBSI was terminated as property manager, a unanimous vote by the TIC owners was required to appoint a new manager. Under the terms of a TIC agreement, there was no provision for direct control of the property by the TIC owners.

Mr. Mathews received steady payments with respect to his TICs over the next few years and sold one of them.[5] However, in 2008, things changed.

*DBSI Bankruptcy; Examiner's Report*

In 2008, Mr. Mathews learned that DBSI would be suspending payments for certain of the TICs. Mr. Mathews then contacted Mr. Weiss, who, according to Mr. Mathews, assured him that payments would resume and that he should not worry.[6] In November 2008, DBSI filed a voluntary petition for bankruptcy under Chapter 11 of the bankruptcy code.[7] All of the properties underlying Mr. Mathews' TICs became the subject of foreclosure proceedings.

The bankruptcy court appointed an attorney from a prominent Washington, D.C., law firm as an examiner to conduct an investigation into DBSI. *In re: DBSI, Inc.*, No. 1:08–bk–12687 (D. Del. filed November 10, 2008). The examiner's report describes a downward spiral fueled by related party transactions, conflicts of interest, growing debt disguised as equity, limited sources of revenue, complex and sloppy accounting, and the misleading of investors. Among other things, the

---

**5.** He sold one of the TICs in 2006 for approximately $551,500 and received cash distributions totaling approximately $583,200 between 2004 and 2011.

**6.** Respondents denied this assertion in their answer, but did not address it in the evidentiary materials submitted with their motion for summary judgment.

**7.** A bankruptcy reorganization under Chapter 11 of the bankruptcy code allows "viable but financially troubled business to remain in business to preserve their 'going concern value.'" J.T. Ferriell & E.J. Janger, Understanding Bankruptcy (3d ed.2013) at 709.

report describes the structure and marketing of the DBSI TICs. The bankruptcy court ultimately made findings similar to those of the examiner in concluding that many of DBSI's transactions were "either constructively or actually fraudulent" and that it would be futile to attempt to unravel many of the related party transactions.

*Licensing and Registration Status*

At the time Mr. Mathews purchased his TICs, Cassidy Turley was licensed by the Maryland Real Estate Commission as a real estate broker. Neither Mr. Weiss nor Cassidy Turley was licensed under the Maryland Securities Act to act as an investment adviser, investment adviser representative, securities broker-dealer, or agent.

*Investigations of DBSI*

Following the collapse of DBSI, the Securities Division of the Maryland Attorney General's Office undertook an investigation of the offer and sale of DBSI TICs in Maryland. In April 2009, the Securities Division contacted Mr. Mathews as part of that investigation. No action was ultimately taken by the Securities Division against DBSI or Cassidy Turley, although Cassidy Turley did refund to Mr. Mathews the fees and commissions it was paid in connection with his TIC transactions. Federal authorities were also conducting a parallel investigation.[8]

**Procedural Background**

*Complaint*

On March 23, 2010, Mr. Mathews filed a complaint in the Circuit Court for Baltimore County against Mr. Weiss and Cassidy Turley.[9] Mr. Mathews' complaint alleged that Cassi-

---

8. We can take judicial notice that, following oral argument in this case earlier this year, the principals of DBSI were indicted by a federal grand jury in Idaho on charges of conspiracy, securities fraud, mail fraud, wire fraud, and related offenses arising out of the operation of DBSI, including the sale of TIC interests. *United States v. Douglas L. Swenson, et al.*, Case No. 1:2013–cr–00091–BLW (D. Idaho, filed April 10, 2013).

9. Mr. Mathews later filed a First Amended Complaint that made some amendments not pertinent to this appeal, but did not change the nature

dy Turley owed Mr. Mathews legal and fiduciary duties to disclose material facts and to act with the care and skill of a "professional financial adviser." It alleged that Cassidy Turley had misled Mr. Mathews concerning the suitability of the TIC investment for his financial situation, the safety of the investment, and the soundness of DBSI. It also alleged that Cassidy Turley had failed to inform him of other material information, including its lack of research into the investment, its receipt of a commission from the sale of the TICs, and the risks associated with the investment. It alleged that Cassidy Turley actively concealed its alleged wrongdoing from him and lulled him into relying upon it, even after the DBSI bankruptcy, until he was contacted by the Securities Division.

The complaint included common law tort claims for fraud, constructive fraud, negligent misrepresentation, and negligence, as well as a claim for breach of contract. It also included a claim under the Maryland Securities Act, Maryland Code, Corporations & Associations Article, ("CA") § 11–703.

The parties conducted discovery. After the completion of discovery, they filed cross-motions for summary judgment, as well as motions in limine related to evidence anticipated to be offered at trial.

*Rulings on Pretrial Motions*

At the pre-trial motions hearing on December 5, 2011, the Circuit Court, among other things, granted a motion in limine

of the claims asserted. In particular, in the First Amended Complaint, Mr. Mathews substituted several Cassidy Turley entities for the original corporate defendants, corrected certain details in the original complaint, added an allegation that Mr. Weiss had erroneously claimed knowledge and experience concerning "§ 1031 transactions," and made other minor changes. After some initial skirmishing by the parties about whether the filing of the First Amended Complaint should be permitted, the Circuit Court accepted the amended pleading at the December 2011 motions hearing. For simplicity, we will refer to "the complaint" in the remainder of this opinion to include the First Amended Complaint.

The Cassidy Turley entities and Mr. Weiss are represented by the same counsel and have presented a joint defense. For ease of reference in the remainder of this opinion, we will use "Cassidy Turley" to refer to the Respondents collectively.

that precluded Mr. Mathews from mentioning or introducing into evidence at trial the bankruptcy examiner's report on the basis that it was inadmissible hearsay, although the court held open the possibility that it would reconsider that ruling at trial. Later in the hearing, the Circuit Court granted summary judgment in favor of Cassidy Turley as to all counts. With respect to the alleged violations of the Maryland Securities Act, the court ruled that the TICs were not securities as defined by the Maryland Securities Act. The court also held that, even if the TICs were securities, Mr. Mathews' claims under the Securities Act were barred by limitations, as were his common law claims. Specifically, the court ruled that Mr. Mathews' Maryland Securities Act claims were time-barred because the limitations period governing those claims could not legally be tolled and that Mr. Mathews' common law fraud claims were time-barred because he should have discovered the injury early enough that tolling would not have been sufficient to bring his filing within the limitations period.

Cassidy Turley had also sought summary judgment on the common law claims on the ground that Mr. Mathews did not plan to present expert opinion testimony on the scope of duty of a real estate broker and that, without such testimony, Mr. Mathews could not prove his common law tort claims as a matter of law. The court declined to grant summary judgment for that reason.

*Appeal*

Mr. Mathews filed a timely notice of appeal, and Cassidy Turley filed a cross-appeal. Prior to briefing and argument in the Court of Special Appeals, Mr. Mathews filed a petition for a writ of certiorari, which we granted.

## Discussion

The parties have asked us to resolve five issues, which we describe as follows:

1. Are the DBSI TICs "securities"?
2. Are Mr. Mathews' claims under the Maryland Securities Act barred by limitations?

3. Are Mr. Mathews' common law tort claims barred by limitations?

4. Should the Circuit Court have also awarded summary judgment in favor of Cassidy Turley because Mr. Mathews did not intend to present expert testimony on the standard of care of a real estate broker?

5. Would the DBSI bankruptcy examiner's report be admissible in evidence at a trial under the hearsay exception for public records and reports? May it be relied upon by securities law experts who may testify at trial?

We address each of these issues in turn after reviewing briefly the relevant standards of appellate review.

### *Standard of Review*

■ Under the Maryland Rules, a circuit court may grant summary judgment if there is no dispute as to material fact and the moving party is entitled to judgment as a matter of law. Maryland Rule 2–501(f). The court is to consider the record in the light most favorable to the non-moving party and consider any reasonable inferences that may be drawn from the undisputed facts against the moving party. Because the circuit court's decision turns on a question of law, not a dispute of fact, an appellate court is to review whether the circuit court was legally correct in awarding summary judgment without according any special deference to the circuit court's conclusions. *Ross v. Housing Authority of Baltimore City*, 430 Md. 648, 666–67, 63 A.3d 1 (2013).

■ If an appellate court comes to a different conclusion on the pertinent question of law and reverses a grant of summary judgment by a trial court, the appellate court will not ordinarily seek to sustain the grant of summary judgment on a different ground. *See Geisz v. GBMC*, 313 Md. 301, 314 n. 5, 545 A.2d 658 (1988). Such action would interfere with the discretion that a trial court normally enjoys to deny, or to defer until trial, consideration of the merits of summary judgment on certain issues. *Henley v. Prince George's County*, 305 Md. 320, 333, 503 A.2d 1333 (1986). Of course, that

rationale would not pertain if the circuit court would have no discretion as to the particular issue.

▮▮▮▮ With respect to the admissibility of evidence, such as the bankruptcy examiner's report, the standard of appellate review depends on the basis for admission or exclusion of a particular item of evidence. Some matters, such as the weighing of the relevance of proffered evidence as against unfair prejudice or other considerations, are left to the "sound discretion" of the trial court. *Hall v. UMMS*, 398 Md. 67, 82, 919 A.2d 1177 (2007). Such decisions will be reversed only for abuse of discretion. Other evidentiary rulings are based on a "pure legal question." *Id.* In those circumstances, an appellate court considers the legal question without deference to the decision of the trial court.

### *Whether a DBSI TIC is a security under the Maryland Securities Act*

#### *Maryland Securities Act*

The Maryland Securities Act, which is codified at Maryland Code, Corporations & Associations Article ("CA") § 11–101 *et seq.*, regulates the offer and sale of securities in Maryland, as well as the individuals who advise on and effect such transactions. In particular, any security offered for sale must be registered pursuant to the Act, unless the particular security is excepted from the registration requirement by statute or regulation. CA § 11–501. Subject to certain exceptions, securities broker-dealers (popularly known as brokerage firms) and their agents (popularly known as stockbrokers) must be registered under the Act. CA §§ 11–401(a), 11–402(a). Similarly, firms and financial advisers that fit the statute's definitions of "investment adviser" and "investment adviser representative" are also subject to a registration requirement. CA §§ 11–401(b), 11–402(b).[10]

---

10. Subject to certain exceptions, "investment adviser" is defined as follows:

(1) "investment adviser" means a person who, for compensation:

The statute contains several anti-fraud provisions. Pertinent to the allegations in this case, CA § 11–301 broadly prohibits fraud in the offer or sale of securities [11]; CA § 11–302 similarly prohibits fraud and misrepresentation in connection with advisory activities.[12]

---

(i) Engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; or

(ii)(1) Provides or offers to provide, directly or indirectly, financial and investment counseling or advice, on a group or individual basis;

(2) Gathers information relating to investments, establishes financial goals and objectives, processes and analyzes the information gathered, and recommends a financial plan; or

(3) Holds out as an investment adviser in any way, including indicating by advertisement, card, or

CA § 11–101(h)(1). Various entities and professionals are excluded from the category by statute or regulation. CA § 11–101(h)(2).

**11.** The statute provides:

It is unlawful for any person, in connection with the offer, sale, or purchase of any security directly or indirectly to:

(1) Employ any device, scheme, or artifice to defraud;

(2) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(3) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person.

CA § 11–301.

**12.** The statute provides, in pertinent part:

(a) It is unlawful for a person who receives, directly or indirectly, any consideration from another person for advising the other person as to the value of securities or their purchase and sale . . . to:

(1) Employ any device, scheme, or artifice to defraud the other person;

(2) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on the other person;

. . . . . .

(c) In the solicitation of or in dealings with advisory clients, it is unlawful for any person knowingly to make any untrue statement of a material fact, or omit to state a material fact in order to make the statements made, in light of the circumstances under which they are made, not misleading.

CA § 11–302(a), (c).

The Act creates the position of Maryland Securities Commissioner ("Commissioner") and the Maryland Securities Division within the Office of the Attorney General and charges them with various regulatory duties under the Act. CA § 11–201 *et seq.* The Commissioner is to adopt regulations implementing the Act and to coordinate with federal and state securities officials in other jurisdictions in the interpretation and enforcement of the securities laws. CA § 11–203(a), (b). The Commissioner may investigate alleged violations of the Act and institute administrative and judicial actions to enforce the provisions of the Act. CA § 11–701 through § 11–702.

The Act also provides a private cause of action to enforce various provisions of the Act. CA § 11–703. In particular, under CA § 11–703(a)(1)(i), a purchaser of a security has a cause of action against the seller for a registration violation, a misleading statement concerning the significance of registration, or a failure to comply with a regulation concerning approval of advertising. Under CA § 11–703(a)(1)(ii), a purchaser has a cause of action against the seller for untrue statements—or omissions—of material fact in connection with the offer or sale of a security. Under CA § 11–703(a)(2), a seller of a security has a cause of action for false statements— or omissions—of material fact by the buyer. CA § 11–703(a)(3) creates a cause of action against persons acting as investment advisers or investment adviser representatives for registration violations and fraud.

The General Assembly has directed that the Maryland Securities Act be construed to carry out the general purpose of encouraging uniformity in state laws regulating securities and investment professionals and "to coordinate the interpretation and administration of this title with the related federal regulation." CA § 11–804. This is no doubt related to the shared lineage of the Act with the federal securities laws and securities laws of many other states [13] and the need to coordi-

---

**13.** The Maryland Securities Act was based upon the Uniform Securities Act of 1956, as are the securities statutes of a number of other states. *See* Report of Committee to Study the Administration of the Blue Sky

nate regulation of an industry that conducts business nation-wide.

*Securities Count of the Complaint*

Count VI of the complaint asserts a cause of action under the Maryland Securities Act, although it is not precise in describing the violation or violations that it alleges. That count cites to the Act generally, refers to the "unlawful offer and sale of the unregistered DBSI TIC securities," and alleges that the "Defendants engaged in a scheme, device and/or artifice to defraud Mathews. . . ." The count does not specify a particular subsection or paragraph of CA § 11–703 and, indeed, appears to combine more than one type of violation. In any event, a predicate question as to the viability of this cause of action is whether the DBSI TICs are securities.

The Circuit Court granted summary judgment in favor of Respondents on Count VI stating, in an oral ruling, that "I'm not convinced that the interests that were sold and purchased by Mr. Mathews were securities." The court did not elaborate and conceded that its "degree of confidence" in that ruling was not as great as with respect to other rulings it was making.

*"Security"*

The Maryland Securities Act defines "security" by listing examples:

> (r)(1) "Security" means any:
>
> (i) Note;
>
> (ii) Stock;

---

Laws of Maryland—to the Legislative Council and the General Assembly of Maryland (October 11, 1961); Sargent, *State Disclosure Regulation and the Allocation of Regulatory Responsibilities*, 46 Md. L.Rev. 1027, 1030 (1987); Miller, *A Prospectus on the Maryland Securities Act*, 23 Md. L.Rev. 289 (1963). That model law was designed in many respects to mimic or coordinate with related provisions of the federal securities laws. *See* Uniform Securities Act with Official Comments and Draftsmen's Commentary, *reprinted in* L. Loss & E.M. Cowett, Blue Sky Law (1958), Appendix I. The federal Securities Act of 1933 itself had built upon concepts developed in earlier state securities laws. *See* 2 Hazen, The Law of Securities Regulation (5th ed. 2005 & 2012 Supp.) at 28–29.

(iii) Treasury stock;

(iv) Bond;

(v) Debenture;

(vi) Evidence of indebtedness;

(vii) Certificate of interest or participation in any profit-sharing agreement;

(viii) Collateral-trust certificate;

(ix) Preorganization certificate or subscription;

(x) Transferable share;

(xi) Investment contract;

(xii) Voting-trust certificate;

(xiii) Certificate of deposit for a security;

(xiv) Certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under the title or lease;

(xv) In general, any interest or instrument commonly known as a "security"; or

(xvi) Certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase any of the preceding.

(2) "Security" does not include any insurance or endowment policy or annuity contract under which an insurance company promises to pay money either in a lump sum, periodically for life, or some other specified period.

CA § 11–101(r). The definition of "security" in CA § 11–101 closely matches that in federal law.[14]

▇▇ Of the examples set out in the statutory definition of "security," Mr. Mathews identifies the DBSI TIC as an "investment contract"—a species of security that also appears in the federal definition. *See* CA § 11–101(r)(xi); 15 U.S.C. § 77b (a)(1).[15] Given the mandate in the Act to coordinate

---

**14.** *See* Securities Act of 1933, § 2(a)(1), 15 U.S.C. § 77b (a)(1).

**15.** Mr. Mathews has not suggested that a TIC interest fits into any other category and therefore we have not considered any of the other listed examples of securities.

with related federal regulation and the lack of other precedent in Maryland, the interpretation of an identical phrase in the federal securities laws is persuasive as to construction of the Maryland statute. *See Caucus v. Maryland Securities Commissioner*, 320 Md. 313, 324–37, 577 A.2d 783 (1990) (following Supreme Court precedent under federal securities law in determining whether promissory notes fit the definition of "security" in the Maryland Securities Act).

This Court has not previously addressed the meaning of "investment contract" in the Maryland Securities Act. Early in the last decade, the Court of Special Appeals had occasion to do so, in the context of a different type of investment. In *Ak's Daks Communications v. Maryland Securities Division*, 138 Md.App. 314, 771 A.2d 487, *cert. denied*, 365 Md. 473, 781 A.2d 778 (2001), the intermediate appellate court considered whether an interest in a limited liability company (which offered two-way radio services), coupled with a contract with the promoters to manage the LLC, was an "investment contract" for purposes of the Maryland Securities Act. The court appropriately looked to the Supreme Court decision in *SEC v. Howey*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the foundational federal case construing "investment contract" under the federal securities law.[16]

In *Howey*, the Supreme Court held that "an investment contract for purposes of the [federal] Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise." 328 U.S. at 298–99, 66 S.Ct. 1100. The Court observed that the traditional understanding of investment contract involved disregarding

---

16. Notably, the *Howey* Court derived its definition of "investment contract" for purposes of federal law from earlier state court decisions construing state securities laws. *See SEC v. Edwards*, 540 U.S. 389, 393–94, 124 S.Ct. 892, 157 L.Ed.2d 813 (2004).

form in favor of substance and an emphasis on "economic reality." *Id.* at 298, 66 S.Ct. 1100. It is immaterial, therefore, "whether there is a sale of property with or without intrinsic value." *Id.* at 301, 66 S.Ct. 1100. "It embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299, 66 S.Ct. 1100.

Subsequent Supreme Court decisions have re-affirmed the *Howey* definition of "investment contract" for purposes of the federal securities laws.[17] A significant number of state courts that have construed the same phrase in state securities laws have also adopted the *Howey* definition of "investment contract." *See* Annotation, *What constitutes an "investment contract" within the meaning of state blue sky laws*, 47 A.L.R.3d 1375. Given the mandate of CA § 11–804 to promote uniformity in the securities laws, it is appropriate to apply the *Howey* test as part of Maryland securities law.

As indicated above, in its original statement of the *Howey* standard, the Supreme Court stated that an investor's expectation of profits derives "*solely* from the efforts of the promoter or a third party." 328 U.S. at 299, 66 S.Ct. 1100 (emphasis added). But neither federal nor state courts have interpreted that articulation to exclude the exertion of any efforts by the investors.

In *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir.1973), the Ninth Circuit explained the need for a flexible interpretation. The investment in *Turner* required that "the investor, or purchaser, must himself exert some efforts if he is to realize a return on his initial cash outlay." 474 F.2d at 482. Therefore, any profit to that investor would not be, strictly speaking, "solely" due to the efforts of the promoter or a third party. If the Supreme Court's use of the

---

17. *See United Housing Found., Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); *Int'l Bhd. of Teamsters v. Daniel,* 439 U.S. 551, 558 n. 11, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979); *Reves v. Ernst & Young,* 494 U.S. 56, 64, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990).

term "solely" was taken literally, such an investment would not be an "investment contract." In rejecting the result that would necessarily follow from applying a strict interpretation, the Ninth Circuit stated:

> Adherence to such an interpretation could result in a mechanical, unduly restrictive view of what is and what is not an investment contract. It would be easy to evade by adding a requirement that the buyer contribute a modicum of effort. Thus the fact that the investors here were required to exert some efforts if a return were to be achieved should not automatically preclude a finding that the Plan or Adventure is an investment contract. To do so would not serve the purpose of the legislation. *Rather we adopt a more realistic test, whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.*

*Id.* at 482 (emphasis added). This interpretation of the *Howey* standard has been nearly universally adopted by the federal circuits [18] as well as by at least six states.[19]

█ In *United Housing Found., Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), the Supreme Court acknowledged the Ninth Circuit's *Turner* decision but, noting that the issue of what constitutes "solely from the efforts of

---

18. *See SEC v. Aqua–Sonic Prods. Corp.,* 687 F.2d 577, 582 (2d Cir. 1982); *Lino v. City Investing Co.,* 487 F.2d 689, 692–93 (3d Cir.1973); *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.,* 840 F.2d 236, 240 n. 4 (4th Cir.1988); *Long v. Shultz Cattle Co.,* 881 F.2d 129, 133 (5th Cir.1989); *SEC v. Professional Assocs.,* 731 F.2d 349, 357 (6th Cir.1984); *Kim v. Cochenour,* 687 F.2d 210, 213 n. 7 (7th Cir.1982); *Miller v. Cent. Chinchilla Grp., Inc.,* 494 F.2d 414, 416–17 (8th Cir. 1974); *Baurer v. Planning Group Inc.,* 669 F.2d 770, 779 (D.C.Cir. 1981); *Aldrich v. McCulloch Properties, Inc.,* 627 F.2d 1036, 1040 n. 3 (10th Cir.1980)

19. *See State v. Gertsch,* 137 Idaho 387, 49 P.3d 392, 393 (2002); *State ex rel. Miller v. Pace,* 677 N.W.2d 761, 767 (Iowa 2004); *Scholarship Counselors, Inc. v. Waddle,* 507 S.W.2d 138, 142 (Ky.1974); *Tschetter v. Berven,* 621 N.W.2d 372 (S.D.2001); *Searsy v. Commercial Trading Corp.,* 560 S.W.2d 637, 641 (Tex.1977); *Cellular Eng'g v. O'Neill,* 118 Wash.2d 16, 820 P.2d 941, 946 (1991).

others" was not actually at issue in the case before it, expressly declined to comment on the correctness of that interpretation. *Id.* at 852 n. 16, 95 S.Ct. 2051. Nonetheless, the Court observed that "[t]he touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others"—a formulation in which the word "solely" does not appear. *Id.* at 852, 95 S.Ct. 2051. The Court then went on to hold that the interests in the case before it were not investment contracts because those interests offered no possibility for profit. *Id.* at 854–55, 95 S.Ct. 2051.[20] Although the Court declined to comment on *Turner* and the issue was irrelevant to the decision of that case, a number of state courts have read the Court's "touchstone" formulation as an indication that the Court does not exclude the possibility that an investment contract may contemplate some effort by investors.[21] The Court of Special Appeals expressed such an understanding in *Ak's Daks* in applying the *Howey* test for purposes of the Maryland Securities Act [22] and we take this occasion to affirm that understanding.

Cassidy Turley does not dispute that the *Howey* test defines "investment contract" under the Maryland Securities Act. Rather, it argues that the application of the *Howey* test to the DBSI TICs leads to a conclusion that the TICs were not securities.

---

**20.** *Forman* concerned shares of stock in a cooperative housing project that entitled purchasers to lease an apartment in the project and that could not be transferred to a non-tenant.

**21.** *See Bahre v. Pearl,* 595 A.2d 1027, 1031 (Me.1991); *State v. Duncan,* 181 Mont. 382, 593 P.2d 1026, 1032–33 (1979); *Majors v. S.C. Secs. Comm'n,* 373 S.C. 153, 644 S.E.2d 710, 717–18 (2007); *Northern Terminals v. Leno,* 136 Vt. 369, 392 A.2d 419, 421 (1978).

As the Court of Special Appeals has noted, in cases subsequent to *Forman,* the Supreme Court has sometimes quoted *Howey,* including its use of the term "solely" and sometimes restated the test without that word. *Ak's Daks Communications,* 138 Md.App. at 329 n. 6, 771 A.2d 487.

**22.** 138 Md.App. at 328–29, 771 A.2d 487.

*Application of the Howey Test to the DBSI TICs*

 The *Howey* test essentially involves three elements: (1) an investment of money; (2) in a common enterprise; (3) with an expectation of profits derived from the efforts of others. There appears to be no dispute as to the first two elements. Mr. Mathews undeniably made an investment of money. And Cassidy Turley does not appear to contest that it was part of a "common enterprise." [23] The sole point of contention is whether Mr. Mathews and his fellow investors had an expectation of profits derived from the efforts of others.

It is undisputed that Mr. Mathews was to receive a specified annual income stream derived from profits obtained by DBSI's rental of the TIC properties. What is in dispute is whether the anticipated profits would be based significantly on the efforts of the promoter or a third party.

The DBSI TICs were sold with a pre-existing agreement that laid out the operation and management of the investment. Individual investors, like Mr. Mathews, had no authority to manage the investment. Under the pre-existing management agreement with DBSI—in the form of a sublease—DBSI would locate sub-tenants and undertake the management of the property. The TIC purchasers were largely passive investors. Only by acting collectively could the TIC investors

---

**23.** Thus, we need not, for purposes of this case, enter into the debate among the federal courts of appeals concerning the different conceptions of the common enterprise element that have come to be known as "horizontal commonality," "broad vertical commonality," and "strict vertical commonality"—a debate that the Supreme Court has declined so far to referee. *See Mordaunt v. Incomco,* 469 U.S. 1115, 105 S.Ct. 801, 83 L.Ed.2d 793 (1985) (White, J., dissenting from denial of certiorari). In any event, whether one requires a pooling of investor money (horizontal commonality), a link between the fortunes of the investor and the efforts of the promoter (broad vertical commonality), or a link between the fortunes of the investor and the fortunes of the promoter (strict vertical commonality), all would appear to be satisfied in this instance. *See generally* 1 Hazen, The Law of Securities Regulation (5th ed. 2005 & 2012 Supp.) at 75–78.

remove DBSI and put in place new management. That collective action was contingent on a unanimous decision to install a new manager and an obligation to indemnify DBSI.[24] In the case of the TIC investments, the efforts made by those other than the investor—in the case of these TICs, DBSI, the manager—are no less dominant, significant, and essential to the failure or success of the enterprise than are the efforts of a corporation's management. The third requirement of the *Howey* test is satisfied.[25]

As the requirements of the *Howey* test are satisfied, the TIC investment is a security for purposes of the Maryland Securities Act.[26]

---

**24.** The end result was an investment vehicle that resembled a corporation, stitched together by contract and property law, and the TIC interests resembled shares in that corporation. As the Supreme Court has observed, economic characteristics traditionally associated with stock distinguish it as a security. *Reves v. Ernst & Young*, 494 U.S. 56, 62, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990). Here the economic characteristics of the TICs resemble those of stock in a corporation.

**25.** The Supreme Court of Colorado reached a similar conclusion in *Lowery v. Ford Hill Inv. Co.*, 192 Colo. 125, 556 P.2d 1201, 1203 (1976). That case involved a sale of real estate conditioned on an agreement to an "exclusive management and rental contract." A contract that could be terminated by a two-thirds vote of all the individual unit owners. The court held this investment to be a security. A useful comparison can also be made with *Fargo Partners v. Dain Corp.*, 540 F.2d 912, 914–15 (8th Cir.1976) (investment found not to be a security where a manager exercised control but property was directly owned by one investor that could terminate the manager at will); *see also Schultz v. Dain Corp.*, 568 F.2d 612, 615 (8th Cir.1978) (same).

**26.** Other authorities applying a similar definition of "security" have reached the same conclusion. For example, the National Association of Securities Dealers ("NASD"), the self-regulatory organization now known as the Financial Industry Regulatory Authority ("FINRA"), issued a Notice to Members in 2005 noting that TICs that are structured and sold by an entity that also manages the property "generally would constitute investment contracts and thus securities under the federal securities laws." NASD, Notice to Members 05–18 (March 2005) at 3. At least one other state supreme court has reached that conclusion with respect to TICs issued by DBSI similar to those at issue in this case. *Redding v. Montana First Judicial District Court*, 365 Mont. 316, 281 P.3d 189 (2012) (DBSI TICs were investment contracts under Securities Act of Montana).

*Whether Mr. Mathews' claims are barred by statutes of limitations*

The Circuit Court granted summary judgment as to all counts of the complaint on the basis of limitations. Mr. Mathews has appealed that determination. The court devoted most of its analysis to the claim under the Securities Act, as have the parties on appeal, perhaps because the Securities Act has its own statute of limitations while the common law claims are governed by the general limitations provision. Accordingly, we address the application of limitations to the statutory and common law claims separately.

*Claim under the Maryland Securities Act*

Count VI of the complaint seeks relief pursuant to the Maryland Securities Act. The section of the Maryland Securities Act that establishes a private cause of action sets forth specific periods of limitations for the various types of claims that might be brought under the Act. CA § 11–703(f).[27] None of the periods set forth in the statute is longer than three years from the date of sale of a security or the rendering of investment advice. It appears that the Circuit Court simply held that any claim that Mr. Mathews had under the Securities Act accrued in October 2004 when he purchased the DBSI TICs (*i.e.*, there was no basis for tolling accrual of a claim),

---

27. The statute provides, in pertinent part:

(f)(1) A person may not sue under subsections (a)(1) and (2) of this section after the earlier to occur of 3 years after the contract of sale or purchase or the time specified in paragraph (2) of this subsection.

(2) An action may not be maintained:

(i) To enforce any liability created under subsection (a)(1)(i) of this section, unless brought within one year after the violation on which it is based; or

(ii) To enforce any liability created under subsection (a)(1)(ii) or (2) of this section, unless brought within one year after the discovery of the untrue statement or omission, or after the discovery should have been made by the exercise of reasonable diligence.

(3) A person may not sue under subsection (a)(3) of this section more than 3 years after the date of the advisory contract or the rendering of investment advice, or the expiration of 2 years after the discovery of the facts constituting the violation, whichever first occurs.

CA § 11–703(f)(1)–(3).

noted that he filed his initial complaint in March 2010, and found that the interval between the two dates exceeded three years.

 Mr. Mathews argues that his complaint was timely filed because the accrual of his claims under the Maryland Securities Act was delayed. He relies on a judicially-created "discovery rule," under which a cause of action accrues when the wrong is discovered or when with due diligence it should have been discovered. *Poffenberger v. Risser,* 290 Md. 631, 634, 431 A.2d 677 (1981). In addition, he argues that a statute that delays accrual of causes of action when a plaintiff remains ignorant of a cause of action due to a defendant's "fraudulent concealment" should be applied to find his claims timely. That statute provides:

> If the knowledge of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud.

Maryland Code, Courts & Judicial Proceedings Article ("CJ"), § 5–203. Mr. Mathews asserts that Cassidy Turley fraudulently concealed critical information and that he was not on notice of his claims under the Maryland Securities Act until he met with representatives of the Maryland Securities Commissioner in April 2009.

 Cassidy Turley argues, in turn, that the limitations scheme of the Securities Act includes statutes of repose that cannot be tolled by the discovery rule or CJ § 5–203. This Court recently discussed the distinction between statutes of limitation and statutes of repose in *Anderson v. United States,* 427 Md. 99, 46 A.3d 426 (2012). Although the phrases "statute of limitations" and "statute of repose" are often used interchangeably, one practical difference between the two is that a statute of repose is not subject to tolling rules such as the discovery rule or CJ § 5–203. 427 Md. at 121, 46 A.3d 426. The chief feature of a statute of repose is that it runs from a date that is unrelated to the date of injury, whereas a statute

of limitations always runs from the time the wrong is complete and actionable—and injury is always the final element of a wrong. *Id.* at 119, 46 A.3d 426. As a result, a statute of repose can sometimes foreclose a remedy before an injury has even occurred and before any action could have been brought.

In *Anderson,* the Court considered the appropriate characterization [28] of CJ § 5–109(a)(1), which provides that a medical malpractice action must be brought "within the earlier of" five years from the time of injury or three years from the date the injury was discovered. The Court acknowledged the overlapping features of statutes of limitation and statutes of repose and chose not to rely on any single feature of the statute. 427 Md. at 123, 46 A.3d 426. It noted that the Legislature had elected to measure the periods set forth in CJ § 5–109(a)(1) from the time of injury, as opposed to some date unrelated to the injury, and that the period was explicitly subject to tolling for fraudulent concealment and minority—factors at odds with a conclusion that it was a statute of repose. *Id.* at 125–26, 46 A.3d 426. The Court concluded that, despite prior disparate characterizations of the statute, CJ § 5–109(a)(1) was more appropriately classified as a statute of limitations. *Id.* at 127, 46 A.3d 426.

Like CJ § 5–109(a)(1), the limitations provisions for private causes of action under the Maryland Securities Act are phrased in terms of the "the earlier to occur" of two alternative time periods. Our task in this case is easier than in *Anderson* in that there is no need to settle on a precise classification of the provisions in the Securities Act as statutes of repose or statutes of limitations in order to apply them; our task is more difficult in that there are different provisions to apply, depending on the nature of the violation alleged.

---

**28.** While the label applied would not normally matter, the classification of the statute as one of limitations or one of repose in that case was necessary to determine whether a federal or state period of limitations controlled a claim under the Federal Tort Claims Act. 427 Md. at 102–3, 46 A.3d 426.

Our application of the relevant limitations periods under the Securities Act to Mr. Mathews' complaint is hampered by the fact that the single count of the complaint under the Maryland Securities Act appears to combine several different claims, in that it alleges generally both fraud and lack of registration. Mr. Mathews' pre-trial statement, and submissions to the court in connection with cross-motions for summary judgment, are somewhat more specific in explaining that he means to assert "multiple violations of the Maryland Securities Act." There appear to be four theories of recovery for which the Act provides a cause of action in CA § 11–703(a) [29]:

(1) that Cassidy Turley sold an unregistered security (CA § 11–703(a)(1)(i));

(2) that Cassidy Turley acted as a securities broker-dealer without being registered under the Act (CA § 11–703(a)(1)(i));

(3) that Cassidy Turley made misrepresentations or omissions of material fact in connection with the sale of a security (CA § 11–703(a)(1)(ii)); and

(4) that Cassidy Turley acted as an investment adviser without being registered under the Act and made material misrepresentations in that capacity (CA § 11–703(a)(3)).

The Act sets forth, in CA § 11–703(f), the period of time within which each of these causes of action must be asserted. We consider the application of those limitations periods, and whether the tolling rules apply, with respect to each of these causes of action.

*1. Sale of unregistered security*

 First, it appears that Mr. Mathews alleges that Cassidy Turley was involved in the offer and sale of an unregistered security—*i.e.,* the DBSI TICs—in violation of CA § 11–501.[30]

---

**29.** A related cause of action imposes liability on certain other persons who materially aid the violation. CA § 11–703(c).

**30.** There does not appear to be any dispute that the TICs had not been registered as securities. Rather, as indicated earlier in this opinion, the

The private cause of action for such a violation is found in CA § 11–703(a)(1)(i). Under CA § 11–703(f)(1) & (2)(i), such a cause of action may not be brought "after the earlier to occur" of (1) three years after the contract of sale or purchase or (2) one year after the violation. As the sale occurred in October 2004, the latest possible date for filing such a cause of action under this provision might well be October 2005, and certainly no later than October 2007.

CA § 11–703(a)(1) creates liability only in favor of a purchaser of a security, not in favor of one to whom a security is merely offered. Moreover, the statute provides a remedy only when a sale has been completed. CA § 11–703(b)(1). The fact that a discovery provision was inserted in the other limitations provisions in CA § 11–703(f), but not in the provision related to registration violations, suggests that discovery was not expected to be an issue and it is therefore inappropriate to apply the judicially-created discovery rule in this context.[31] Given that a reasonably prudent buyer could determine at the time of sale from publicly available information whether a security is registered, tolling under the fraudulent concealment provision of CJ § 5–203 is not appropriate. The overall scheme with respect to registration violations thus operates as a statute of repose with respect to registration

dispute is whether they were "securities" subject to the registration requirement of the Act.

**31.** As noted earlier, the Maryland Securities Act was based upon the Uniform Securities Act of 1956. *See* footnote 13 above. Like the Uniform Act, the Maryland Act, at its inception, included a period of limitations for private actions that expired "two years after the contract of sale." Maryland Code, Article 32A, § 34 (1957, 1963 Supp.). Although the official comments to the Uniform Act are silent on this question, the drafters published a commentary that includes some guidance as to its application. L. Loss & E. Cowett, Blue Sky Law (1958). That commentary confirms that it was not intended to incorporate a discovery rule. *Id.* at 394. A statutory discovery rule—similar to that in the federal securities law—was later added to the Act with respect to other types of violations. Chapter 732, Laws of Maryland 1968. A current version of that discovery rule appears in CA § 11–703(f)(2)(ii), which is discussed below in relation to the claim of fraud in the offer or sale of a security.

violations. Courts have reached a similar conclusion with respect to a limitations provision related to registration violations in the federal securities law. *See, e.g., Sagehorn v. Engle,* 141 Cal.App.4th 452, 461, 46 Cal.Rptr.3d 131, 136 (2006); *see also Blatt v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 916 F.Supp. 1343, 1353 (D.N.J.1996); *Lubin v. Sybedon Corp.,* 688 F.Supp. 1425, 1451 (S.D.Cal.1988).

To the extent that Mr. Mathews asserts a claim for sale of unregistered securities, that claim is time-barred.

### 2. *Transacting business as securities broker-dealer or agent without being registered*

■■■ The complaint states that neither Cassidy Turley nor DBSI were licensed to offer and sell securities, apparently alleging a violation of CA §§ 11–401(a) and 11–402(a). Such a cause of action also falls under CA § 11–703(a)(1)(i).[32] Accordingly, it would be subject to the same limitations provision as the claim for sale of an unregistered security. For the reasons set forth in the previous section, the period of limitations related to such a claim expired prior to the filing of the complaint, and neither the discovery rule nor CJ § 5–203 tolls the period within which a suit had to be brought. Such a claim is also time-barred.

### 3. *Fraud in the offer or sale of a security*

■■■ The complaint alleges that, in soliciting Mr. Mathews to purchase the DBSI TICs, Cassidy Turley "engaged in a scheme, device, and/or artifice to defraud Mathews" in violation of the Act and further that the violations were "evidenced by repeated misstatements of fact and/or omissions of fact" by Cassidy Turley. This appears to assert a claim under CA § 11–703(a)(1)(ii) & (c), which provides a cause of action for

---

**32.** Again there appears to be no dispute that Cassidy Turley was not registered as a securities broker-dealer, nor was Mr. Weiss registered as an agent of a broker-dealer. Rather, the issue is whether the investment that they helped Mr. Mathews purchase qualifies as a security such that they would be subject to the Act's registration requirement for facilitating the sale.

the buyer of a security against the seller—and any "broker-dealer or agent who materially aids" the seller—for fraud or misrepresentation in the offer or sale of the security.[33]

Under CA § 11–703(f)(1) & (2)(ii), such a cause of action may not be brought "after the earlier to occur" of (1) three years after the contract of sale or purchase or (2) one year after "discovery of the untrue statement or omission, or after the discovery should have been made by the exercise of reasonable diligence." There is a discovery rule built into this period of limitations, but that discovery rule is limited in application to three years after the contract of sale or purchase, as the statute expires upon the "earlier to occur" of the alternative time periods. The scheme is indistinguishable from a one year statute of limitations running from the time of sale with a statutory discovery rule that may toll its expiration for up to two years.

It would be inconsistent with this scheme to apply the judicially-created discovery rule to allow for equitable tolling beyond three years. The Supreme Court reached a similar conclusion when it interpreted a similar limitations provision governing civil actions under the federal securities law. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363–64, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). The Court was concerned with whether the statute should be tolled due to the plaintiff's failure to discover the injury. The Court reasoned that indefinite tolling until discovery was inconsistent with the clear intent of the statute because it would

---

**33.** The statute provides:

 (a)(1) A person is civilly liable to the person buying a security from him if he:

 . . . .

 (ii) Offers or sells the security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and if he does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

Subsection (c) further provides joint and several liability for individuals who materially aid in violations.

render meaningless the legislative choice to include a more limited discovery rule.

The limitations scheme became part of the Maryland Securities Act in a 1968 amendment.[34] At that time, this Court had not yet enunciated the broad discovery rule that it later adopted in *Poffenberger v. Risser*, 290 Md. 631, 431 A.2d 677 (1981). Subsequent to *Poffenberger*, however, the Legislature amended the limitations provisions of CA § 11–703(f)—in particular, to add a limitations provision for causes of action related to investment advisers, as discussed below[35]—but did not modify the limited discovery rule for actions alleging fraud in the offer or sale of securities. Given that the Legislature chose to retain a limited discovery rule for securities fraud actions even after *Poffenberger's* adoption of a broad one indicates a legislative intent to retain a limited discovery rule for actions under the Securities Act. Moreover, application of the more open-ended judicially-created discovery rule in this context would render the more limited statutory discovery rule meaningless—an outcome that counsels against application of the *Poffenberger* discovery rule here. *GEICO v. Ins. Com'r*, 332 Md. 124, 132, 630 A.2d 713, 717 (1993) (interpretations that would render legislative language "meaningless, surplusage, superfluous or nugatory" are disfavored). We therefore conclude that the *Poffenberger* discovery rule does not toll a cause of action for securities fraud under CA § 11–703(a).

Tolling on the basis of a defendant's fraudulent concealment, pursuant to CJ § 5–203, may still apply, however. Tolling under that provision arises from affirmative misconduct by the defendant, not just the exercise of due diligence by the plaintiff. The predecessor of CJ § 5–203 pre-dates the Maryland Securities Act by nearly a century and the General

---

**34.** Chapter 732, Laws of Maryland 1968.

**35.** That amendment created a new limitations scheme for suits against investment advisers—a scheme that contains its own limited discovery provision, much like that found in CA § 11–703(f)(1)–(2). *See* Chapter 805, Laws of Maryland 1989.

Assembly presumably contemplated that it would apply to actions under the Securities Act, particularly those involving allegations of fraud.[36] *Cf. Geisz v. Greater Baltimore Medical Center,* 313 Md. 301, 321–22, 545 A.2d 658 (1988) (CJ § 5–203 may toll limitations as to both statutory and common law claims); *see also Morley v. Cohen,* 610 F.Supp. 798, 820 (D.Md.1985). There is no suggestion otherwise in the history of the Maryland Securities Act.[37] Thus, the running of limitations for fraud in the offer or sale of securities may be tolled pursuant to CJ § 5–203 if the plaintiff's acquisition of knowledge is hindered by fraudulent concealment by the defendant. This is inevitably a fact-intensive inquiry.

The Circuit Court apparently determined that, on the undisputed facts, Mr. Mathews was sufficiently on notice of a potential claim such that the discovery rule would not toll accrual of a cause of action[38] Although Mr. Mathews relied

---

36. Chapter 357, Laws of Maryland 1868.

37. The drafters of the Uniform Securities Act of 1956, on which the Maryland Securities Act was originally based, indicated that a "general law" that provided for tolling based on a defendant's fraudulent concealment of a violation would apply to cases under a state securities law. L. Loss & E. Cowett, Blue Sky Law (1958) at 139. The Supreme Court's *Lampf* decision has been interpreted to preclude tolling of the federal period of limitations on the basis of fraudulent concealment, although some commentators argue that such tolling may still be appropriate. *See Lampf,* 501 U.S. at 374–79, 111 S.Ct. 2773 (Kennedy, J., dissenting); 3 Hazen, The Law of Securities Regulation (5th ed. 2005 & 2012 Supp.) § 12.16[6]-[7].

38. The court stated:

> ... There was nothing hidden about this. [Mr. Mathews] knew exactly what he was buying.... It's not a situation where something was sold to him and he had no ability ... to investigate it, to look at it, to see what it really was. So the discovery rule, it seems to me, even if it were applicable under the Maryland Securities Act, would not be applicable in this particular factual situation....
>
> [W]hat prevented [Mr. Mathews] from investigating the financial condition of DBSI? ... He chose not to because he was happy. He was getting his seven and a half percent or seven percent a year ... He was happy with his investments. And it's only when things went bad that he determines ... I was misled ... there was a fraud. Well, the discovery rule doesn't apply to that.... [C]ertainly, [Mr. Math-

upon CJ § 5–203 in his submissions and briefly argued it at the motions hearing, it is not clear that the Circuit Court considered tolling on the basis of fraudulent concealment separately from the issue of tolling under the discovery rule.

With respect to tolling under CJ § 5–203, Mr. Mathews argues that he viewed Mr. Weiss and Cassidy Turley as his trusted advisers with respect to the TIC investment, that he relied upon them to vet the financial stability of DBSI and the appropriateness of the TIC investment for a person in his circumstances, and that they concealed material information from him that would have undermined that reliance. There appears to be a genuine dispute of material fact on this issue.

Mr. Mathews asserts that Mr. Weiss and Cassidy Turley fraudulently concealed the fact that they were acting as an agent for DBSI in connection with the transaction and received a fee, in the amount of approximately $93,000 from DBSI, out of the proceeds of the transaction. He asserts that these facts were concealed from him until he met with the Securities Division in 2009 and Cassidy Turley refunded fees to him. In an affidavit and deposition testimony, Mr. Mathews described a perfunctory review of the materials in Mr. Weiss' presence, execution of the transactional documents at Mr. Weiss' behest, and shock at the revelation that the person he perceived as his adviser was being paid by the other party to the transaction.

Cassidy Turley contends that Mr. Mathews knew, or should have known, based on his experience as an investor in real estate, that Cassidy Turley would be receiving a fee from DBSI. Cassidy–Turley also asserts that Mr. Mathews evaluated the transaction himself and was well-equipped to do so. It points to Mr. Mathews's receipt of binders with transaction documents, as well as descriptions of the particular properties, prior to the purchase; to statements in the transaction docu-

---

ews], it seems to me, could have determined that there were misrepresentations if, in fact, there were.

ments in which the purchaser affirms that the purchaser has performed due diligence and consulted with independent advisers; and to Mr. Mathews' experience in owning and managing rental properties near Towson University.

At one point in the motions hearing, the Circuit Court appeared to make a credibility determination as to some of the contentions concerning fraudulent concealment.[39] To the extent that determination was a factor in the court's consideration of tolling under CJ § 5–203, it was inappropriate in the context of summary judgment. Whether a plaintiff's failure to discover a cause of action was attributable to fraudulent concealment by the defendant is ordinarily a question of fact to be determined by the factfinder, typically a jury. *Frederick Road Ltd. Partnership v. Brown & Sturm,* 360 Md. 76, 96–100, 756 A.2d 963 (2000); *O'Hara v. Kovens,* 305 Md. 280, 294–95, 503 A.2d 1313 (1986). In any event, the court did not explicitly consider whether the undisputed facts negated tolling under CJ § 5–203. Accordingly, we reverse the award of summary judgment as to the count under the Securities Act to the extent it asserted a claim for fraud.

### 4. Investment adviser violations

Finally, Mr. Mathews seeks recovery against Cassidy Turley for acting as an investment adviser without being registered under the Maryland Securities Act, which would

---

**39.** In discussing the possibility that Mr. Mathews was affirmatively misled by Cassidy Turley as to the nature of the transaction and the broker's role, the court stated:

> ... I think it's going to be offensive to a jury and it's offensive to me to try to make Mr. Mathews out to be this poor little ... teacher, who is, ..., just knows nothing about real estate or nothing about business and he's just this innocent little homemaker who I've got this money and I don't know what to do with it, I mean, it's offensive to me because it's not true.... This guy's not some unsophisticated real estate person. That is, he has a degree of sophistication. You don't do it for forty years and all of a sudden, I don't know anything about it....

violate CA §§ 11–401(b), 11–402(b), and for making material misrepresentations to Mr. Mathews in that capacity, which would violate CA § 11–302(c). There is a private cause of action for such violations under CA § 11–703(a)(3).[40]

Pursuant to CA § 11–703(f)(3), such a claim must be brought no later than the earlier of "3 years after the date of the advisory contract or the rendering of investment advice, or the expiration of 2 years after the discovery of the facts constituting the violation. . . ." Again, there is a discovery rule built into this statute of limitations, but it is capped at three years after the date of the rendering of investment advice (there being no advisory contract in this case). As indicated in the previous section, the presence of a discovery rule within this statutory scheme suggests that it is inappropriate to apply a judicially-created discovery rule that would render the statutory discovery rule meaningless. But, for the same reasons explained in the previous section of this opinion, there appears to be no reason why tolling, pursuant to CJ § 5–203, as a result of a defendant's fraudulent concealment could not be applied with respect to a claim that a defendant made material misrepresentations in the course of rendering investment advice. Again, the issue of fraudulent concealment is largely factual inquiry. Accordingly, we reverse and remand as to this claim for the same reasons as in the previous section.

---

**40.** CA § 11–703(a)(3) provides:

A person is civilly liable to another person if the person:

(i) Acts as an investment adviser or representative in violation of § 11–302(c), § 11–401(b), § 11–402(b), or § 11–304(b) of this title or any rule or order promulgated under it, except that an action based on a violation of § 11–402(b) of this title may not be maintained except by those persons who directly received advice from the unregistered investment adviser representative; or

(ii) Receives, directly or indirectly, any consideration from another person for advice as to the value of securities or their purchase or sale or for acting as an investment adviser or representative under § 11–101(h) and (i) of this title, whether through the issuance of analyses, reports, or otherwise, and employs any device, scheme, or artifice to defraud such other person or engages in any act, practice or course of business which operates or would operate as a fraud or deceit on such other person.

*Limitations with respect to common law claims*

 The next question is whether the Circuit Court erred in granting summary judgment on limitations grounds in favor of Cassidy Turley on Mr. Mathews' common law claims. The complaint includes four tort claims and one claim for breach of contract. The written motion for summary judgment that Cassidy Turley filed did not seek summary judgment on the basis of limitations with respect to the common law claims. However, at the pre-trial motions hearing in December 2011, after the Circuit Court had granted summary judgment on the count under the Securities Act, it proceeded, with the assent of both parties, to consider whether the remaining common law counts were barred by limitations. It concluded that they were.

The common law causes of action were each subject to a three-year statute of limitations. CJ § 5–101. The parties agree that Mr. Mathews' action was filed more than three years after his common law claims would ordinarily have accrued. Mr. Mathews argues, however, that either the *Poffenberger* discovery rule or the tolling provision of CJ § 5–203 based on a defendant's fraudulent concealment tolled limitations for those claims. Similar to its disposition of the count under the Securities Act, the Circuit Court held that the *Poffenberger* discovery rule did not save Mr. Mathews' claims because it concluded that Mr. Mathews should have discovered his injury more than three years before the filing of the action [41] Again, the Circuit Court did not explicitly address the

---

**41.** At the hearing, the Circuit Court explained its ruling:

> [The common law counts are] based on the, the allegations that Mr. Weiss gave Mr. Mathews advice to buy the [TICs] and advised him that they were a good investment and that they were appropriate for him and that he, this was something that was appropriate for him. And he would have given that advice in, on or before 2004. And, in fact, suit is filed in 2010. And the Defendants, as I understand it, have raised the issue of statute of limitations. And I've held that, in fact, the fact that this advice was given, if it was erroneous, if it was wrong, if it was fraudulent, if it was, whatever you want to call it, in 2004, was easily discoverable by Mr. Mathews doing basic investigation as to the accuracy of the advice given by Mr. Weiss . . .

question of tolling under CJ § 5–203 on the basis of fraudulent concealment. We reverse the award of summary judgment as to the common law counts and remand for the same reason as with respect to the fraud claims in Count VI under the Securities Act.

*Whether summary judgment should have been granted based on the absence of expert testimony on the duties of real estate broker*

In connection with its motion for summary judgment on the four counts alleging tort claims, Cassidy Turley argued that each of those claims was ultimately based on a duty allegedly owed by Cassidy Turley to Mr. Mathews. It further argued that expert testimony would be required to establish the relevant standard of care that defined that duty. Because Mr. Mathews did not intend to offer expert testimony on the scope of commercial practice of a real estate broker, Cassidy Turley argued, he would not be able to prove the requisite foundation for his tort claims.[42]

---

> I just think that assuming [Mr. Weiss'] advice, assuming there was a duty and the duty was not to make statements that were misleading, not to have a, not to make false statements to Mr. Mathews about the appropriateness of the investment or the, the nature of the investment, that Mr. Mathews could have determined all of that within a three year period after the advice was given and suit wasn't filed for six years after, that, in fact, the summary judgment should be issued in favor of the Defendants against the Plaintiff because the claims made exceed the statute of limitations and that the discovery rule really doesn't apply here because the Plaintiff, by a reasonable investigation, could have determined that the tort occurred certainly within the three year period from 2004 to 2007 and certainly the action that's filed exceeds that limitations period.

As is evident, the court referred to a tort claim and did not appear to separately consider the breach of contract claim in the complaint. (In its written motion for summary judgment on the breach of contract claim, Cassidy Turley had argued that it did not have a contractual relationship with Mr. Matthews.) Thus, it is not entirely clear that the court intended to grant summary judgment on limitations grounds with respect to the breach of contract claim. In any event, given our disposition of the court's ruling on the common law claims, we need not resolve that issue.

**42.** Cassidy Turley itself proffered expert opinion testimony that a commercial real estate broker has no duty to analyze whether a particular

The Circuit Court denied Cassidy Turley's motion for summary judgment based on the anticipated absence of expert testimony concerning the duties of a licensed real estate broker. The court appeared to accept, at least provisionally, an argument by Mr. Mathews that the duty of a real estate broker could be established by reference to standards set forth in statute and regulation that the court could summarize in a jury instruction.

Cassidy Turley offers this issue as an alternative ground on which summary judgment could be affirmed in its favor. However, the Circuit Court did not grant summary judgment on that ground. Limitations was the sole basis that the court stated for granting summary judgment in favor of Cassidy Turley. As indicated above, an appellate court will not ordinarily sustain a grant of summary judgment on a ground other than that relied upon by the circuit court, unless the circuit court would have lacked discretion to withhold judgment in the movant's favor on the other ground.

■ The common law claims in the complaint contain several references to the "legal and fiduciary duties" allegedly owed to Mr. Mathews by Cassidy Turley, although the pleading is somewhat vague as to the nature and source of such duties. Generally, an enhanced duty of care is often associated with membership in a profession. *Heavenly Days Crematorium, LLC v. Harris, Smariga & Associates, Inc.*, 433 Md. 558, 561, 72 A.3d 199 (2013). In such a case, expert testimony may be necessary to establish the particular standard of care that allegedly has been breached and to elucidate why it was breached, although that is not always the case. 433 Md. at 577, 72 A.3d 199; *Schultz v. Bank of Am., N.A.*, 413 Md. 15, 29, 990 A.2d 1078 (2010).[43]

---

real estate transaction is appropriate for a buyer, given the buyer's finances and investment strategy, or whether the seller has properly characterized the transaction.

**43.** In *Schultz v. Bank of Am., N.A.*, 413 Md. 15, 990 A.2d 1078 (2010), this Court stated: "Where the plaintiff alleges negligence by a professional, expert testimony is generally necessary to establish the requisite

In the argument on Cassidy Turley's summary judgment motion, Mr. Mathews indicated that he intended to prove that Cassidy Turley had violated certain duties of real estate professionals that are defined by reference to standards set forth in statute and regulation and that could be adequately summarized in an appropriate jury instruction. The Circuit Court expressed some skepticism as to the viability of that course, but deferred a final decision until trial.

■■■■ In our view, it was not unreasonable for the Circuit Court to defer decision on the necessity for testimony by an expert real estate broker to establish the standard of care for one or more of the common law claims. It was certainly within the court's discretion to put off that determination until it was clear that one or more of those claims was not barred by limitations and the issue could be assessed in light of other evidence and the proposed jury instructions. Given that the Circuit Court had such discretion and exercised it appropriately, we decline to affirm the grant of summary judgment on the alternative ground advanced by Cassidy Turley. Of course, Cassidy Turley may renew that motion at an appropriate time on remand.

### Whether the bankruptcy examiner's report is admissible

#### Bankruptcy Examiners

The federal bankruptcy code authorizes a bankruptcy court to appoint an examiner to conduct an investigation of the debtor "as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the

---

standard of care owed by the professional. This is because professional standards are often 'beyond the ken of the average layman,' such that the expert's testimony is necessary to elucidate the relevant standard for the trier of fact." 413 Md. at 28, 990 A.2d 1078. (internal citations omitted). The Court also observed, however, that this is not true in every case. For example, where "the alleged negligence is so obvious that the trier of fact could easily recognize that such actions would violate the applicable standard of care," expert testimony would not be required. *Id.* at 21, 990 A.2d 1078.

affairs of the debtor...." 11 U.S.C. § 1104(c). Courts rely on examiner reports for a variety of purposes, including evaluating potential legal claims on behalf of and against the debtor's estate.[44] Examiners also sometimes testify.[45]

One bankruptcy court has described the role of an examiner as "an independent examiner ... that ... will act as an objective nonadversarial party [and] will review the pertinent transactions and documents, thereby allowing the parties to make an informed determination as to their substantive rights. Often, the information that an examiner provides in his or her report serves as a road map for parties in interest ..." *In re FiberMark, Inc.*, 339 B.R. 321, 325 (Bankr.D.Vt.2006) (internal citations omitted). "[Al]though the examiner's report may not be admissible, it is a resource containing information and observations of an independent expert. Bankruptcy courts routinely consider and rely on the testimony and reports of examiners.... [A]n examiner's report is helpful to the court in understanding facts, but is not intended to establish evidence [ ]. In essence, an examiner's report paints a picture, his or her image of what happened in the case, and ends with that expert's opinion of what that story means, in legal terms. The report puts the story on paper and provides a context for debate. It is the duty of the parties to formulate a fuller version of the debate using the rules of evidence." *Id.*

*DBSI Bankruptcy Examiner's Report*

In connection with the DBSI bankruptcy proceeding, the bankruptcy court in Delaware appointed an attorney from a Washington law firm as examiner for the bankrupt estate. The examiner submitted a final report of approximately 265 pages detailing various findings about the operation of the

---

**44.** *See, e.g., In re Apex Oil Co.*, 118 B.R. 683, 688 (Bankr.E.D.Mo.1990) (appointment of examiner to evaluate claims on behalf of estate); *In re Best Prods. Co.*, 168 B.R. 35, 45 (Bankr.S.D.N.Y.1994) (same); *In re Concept Clubs, Inc.*, 125 B.R. 634, 637 (Bankr.D.Utah 1991) (use of examiner's report to evaluate claim against estate).

**45.** *See, e.g., In re General Dev. Corp.*, 147 B.R. 610, 617 (Bankr.S.D.Fla. 1992) (examiner testified as expert witness).

DBSI-related companies, their management, their financial affairs, and the structure and marketing of the DBSI TICs.

*Motion in Limine to Exclude the Report*

Mr. Mathews' counsel intended to offer the bankruptcy examiner's final report in evidence at the trial of this case.[46] In addition, he indicated that certain expert witnesses would rely on and refer to the report as a basis for their opinions.[47] Cassidy Turley filed a motion in limine in the Circuit Court to preclude use of the examiner's report at trial. The Circuit Court orally "granted" that motion, although its ruling in fact only precluded mention of the report before the jury without a further ruling by the court on its admissibility in the context in which it would be offered.[48]

*Admitting the report directly into evidence*

In arguing that the examiner's report may be admitted directly into evidence, Mr. Mathews asserts that the report may be introduced against Cassidy Turley under the doctrine of collateral estoppel, as well as under an exception to the hearsay rule.

Mr. Mathews first argues that Cassidy Turley is bound by the facts asserted in the bankruptcy report on the basis of collateral estoppel because Cassidy Turley is a "privy" of

---

**46.** Cassidy Turley notes that the examiner also submitted an interim report, although Mr. Mathews apparently intended to use only the final report.

**47.** In his brief, Mr. Mathews also asks that his experts be permitted to rely on the findings of fact made by the bankruptcy court in the DBSI bankruptcy. He states that those findings incorporate the examiner's report. Cassidy Turley disputes that the bankruptcy court adopted the examiner's report. We are unable to resolve the matter from the materials in the record in this case. In any event, the findings of the bankruptcy court were not the subject of Cassidy Turley's motion in limine and their admissibility was not ruled upon by the Circuit Court. We decline to provide an advisory opinion on an issue not presented to or decided by the Circuit Court.

**48.** The Court described its ruling in a single sentence: "There'll be no mention of the bankruptcy examiner's report or any parts of it without first having a ruling by the Court as to its admissibility at the time it's sought to be introduced or mentioned."

DBSI. This argument fundamentally misapplies the concept of privity in the collateral estoppel context.

 The analysis of privity for purposes of collateral estoppel focuses on whether the interests of the party against whom estoppel is sought were fully represented, with the same incentives, by another party in the prior matter. *Warner v. German*, 100 Md.App. 512, 520–21, 642 A.2d 239 (1994) (Harrell, J.); *see also Klein v. Whitehead*, 40 Md.App. 1, 12–17, 389 A.2d 374 (1978) (Wilner, J.) (trustee of bankruptcy estate held to be in privity with the bankrupt party for purposes of collateral estoppel). Mr. Mathews has not alleged that Cassidy Turley shared an identity of interests with DBSI in connection with the DBSI bankruptcy proceeding. Indeed, we do not know from the record before us what relationship Cassidy Turley had to the bankrupt estate—whether as a creditor or otherwise. It is not self-evident that whatever contractual relationship existed between DBSI and Cassidy Turley in connection with the marketing and sale of TIC interests established the necessary identity of interests to bind Cassidy Turley by collateral estoppel as to determinations made in the DBSI bankruptcy proceeding.

Second, Mr. Mathews argues that, although the examiner's report constitutes hearsay that is normally inadmissible, it may be admitted into evidence because it fits within an exception in the Maryland Rules for public records and reports. The rule provides, in pertinent part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(8) Public records and reports. (A) Except as otherwise provided in this paragraph, a memorandum, report, record, statement, or data compilation made by a public agency setting forth

(i) the activities of the agency;

(ii) matters observed pursuant to a duty imposed by law, as to which matters there was a duty to report; or

(iii) in civil actions and when offered against the State in criminal actions, factual findings resulting from an investigation made pursuant to authority granted by law.

(B) A record offered pursuant to paragraph (A) may be excluded if the source of information or the method or circumstance of the preparation of the record indicate that the record or the information in the record lacks trustworthiness.

Maryland Rule 5–803(8)(A)–(B).[49] This rule was derived from the hearsay exception set forth in Federal Rule of Evidence 803(8),[50] which this Court essentially incorporated as part of Maryland's common law of evidence, prior to the adoption of Title 5 of the Maryland Rules. *See Ellsworth v. Sherne Lingerie, Inc.,* 303 Md. 581, 603–13, 495 A.2d 348 (1985); 6 L. McLain, Maryland Practice § 803(8).1 (1987). As this Court has previously noted, the "[j]ustification for this exception is the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record." *Ellsworth,* 303 Md. at 606, 495 A.2d 348 (quoting Advisory Committee Note to federal rule).

Rule 5–803(8)(A)(iii) creates an exception to the hearsay rule for a "report ... by a public agency setting forth ... factual findings resulting from an investigation made pursuant to authority granted by law" when offered in evidence in a civil action, if other facts do not suggest it to be untrustworthy.[51] A bankruptcy examiner's report would appear to quali-

---

**49.** There are two additional subparagraphs in this exception, not pertinent to this case. One concerns admissibility in criminal cases of matters observed by law enforcement officers; the other is a savings clause that makes clear that the rule does not supersede statutory provisions on the admissibility of particular records. Maryland Rule 5–803(8)(C), (D). No other Maryland Rule or statute appears to address directly the admission of a bankruptcy examiner's report.

**50.** Despite minor differences in style and wording, Federal Rule of Evidence 803(8) is substantively similar in pertinent part to Maryland Rule 5–803(8).

**51.** The Advisory Committee Note to the federal rule refers to such documents as "evaluative reports" and suggests a number of factors for

fy as a report setting forth factual findings resulting from an investigation made pursuant to authority granted by law and Mr. Mathews seeks to use it in a civil proceeding. However, the question remains whether a bankruptcy examiner is a "public agency" for purposes of this rule.

Strictly speaking, an examiner is not a "public agency." A bankruptcy examiner is very likely to be a disinterested person in the investigation of the debtor's affairs and an examiner's report may well be just as trustworthy in many instances as a government agency report—or perhaps more so. But we cannot render a generic holding to that effect, for each appointment of an examiner is *ad hoc* and much depends on the nature of the particular case, the charge given to the examiner, and how the examiner discharges the duties of the appointment. As indicated above, the bankruptcy courts themselves appear to regard an examiner as a neutral expert appointed for the particular case. *See In re FiberMark, Inc.,* 339 B.R. at 325; *In re Adelphia Communs. Corp.,* 348 B.R. 99, 107 (Bankr.S.D.N.Y.2006) (an examiner is not a judicial officer or master and is "better analogized to a court-appointed expert"); *see also In re Enron Corp. Securities, Derivative & ERISA Litigation,* 623 F.Supp.2d 798, 823–25 & nn. 21, 23 (S.D.Tex.2009) (admitting portions of report on theory that examiner was expert witness in the proceeding, while conceding it was "technically" inadmissible because the examiner had not been designated as an expert by any party). It is also notable that, as best we can determine, the bankruptcy courts, in determining whether to admit an examiner's report into evidence, do not rely on the analogous federal rule of evidence.

---

assessing trustworthiness: (1) the timeliness of the investigation; (2) the special skill or experience of the official; (3) whether a hearing was held and the level at which it was conducted; and (4) possible motivation problems. This Court has adopted the "more liberal view" that factual findings in such records are presumptively admissible and has placed the burden on the party opposing admission to demonstrate the record's unreliability, although the term "factual findings" will be strictly construed to exclude material that is in the nature of an opinion. *Ellsworth,* 303 Md. at 608–12, 495 A.2d 348.

■ Accordingly, a bankruptcy examiner's report is not a public record or report for purposes of the exception to the hearsay rule in Rule 5–803(8) because a bankruptcy examiner is not a public official or agency.[52]

The admissibility of a bankruptcy examiner's report, in light of a hearsay objection, may be more appropriately assessed under the catch-all exception of Maryland Rule 5–803(24). That rule allows for the admission of a statements "not specifically covered by any of the hearsay exceptions listed [in Rules 5–803 and 5–804] but having equivalent circumstantial guarantees of trustworthiness" if the court determines that the statement is evidence of a material fact, is more probative than other reasonably available evidence, and its admission serves the interests of justice.[53] Although an examiner's

---

52. Mr. Mathews directs us to *Redding v. Montana First Judicial District Court,* 365 Mont. 316, 281 P.3d 189 (2012), which, like this case, arose out of a lawsuit by an investor in DBSI TICs. Mr. Mathews contends that the Montana Supreme Court held in *Redding* that the same examiner's report was admissible in evidence. But the *Redding* opinion does not justify that conclusion. The only reference to the examiner's report in the Montana court's opinion is a single sentence indicating that "the examiner found that DBSI was running a Ponzi scheme." 281 P.3d at 193. The court made that statement in the context of its review of a lower court's award of summary judgment in favor a seller of DBSI TICs and was reciting facts "for purposes of this opinion" that were "not materially disputed." *Id.* at 192. There is no suggestion in the opinion that the Montana Supreme Court—or, indeed, the Montana trial court—considered the issue of the admissibility of the report into evidence under a public records hearsay exception.

53. That rule provides:

(24) Other exceptions. Under exceptional circumstances, the following are not excluded by the hearsay rule: A statement not specifically covered by any of the hearsay exceptions listed in this Rule or in Rule 5–804, but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. A statement may not be admitted under this exception unless the proponent of it makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to

report does not come within the exception for public records and reports, it is not obvious that an examiner's report is necessarily any less reliable than one conducted by a public agency; the burden and expense of reproducing the information provided in the report may be prohibitive; and the information in the examiner's report may not be genuinely contested.

This determination is very dependent on the facts of the particular case and the good judgment of the trial court. We also note that such a report may repeat or include out-of-court statements offered for the truth of content—hearsay within hearsay, which may require reference to other hearsay exceptions. *See United States v. Moore,* 27 F.3d 969, 975 (4th Cir.1994).

■■ Finally, the record does not indicate precisely which statements in the report Mr. Mathews wished to use, and the parties have advanced their arguments only in the most general terms. The Circuit Court's oral order on this issue granted the motion excluding the report in its entirety, but the court pointed out that it was open to modifying its order and would reconsider its decision with respect to specific portions of the report that might be offered in the context in which they were offered.

In our view, the Circuit Court wisely declined to make a blanket ruling on admission and use of the examiner's report without more specification and context. (As noted above, the report consists of 265 pages and covers topics well beyond the TICs). To the extent that Mr. Mathews asks that we overrule that approach, we decline to do so.

*Use of the report as the basis for an expert opinion*

Finally, Mr. Mathews argues that, at a trial, his expert witnesses should be permitted to rely on the report of the examiner as well as the findings of fact made by the court in

---

prepare to meet it, the intention to offer the statement and the particulars of it, including the name and address of the declarant. Maryland Rule 5–803(24).

the DBSI bankruptcy. Maryland Rule 5–703(a) defines the permissible bases of expert opinion testimony:

> (a) In general. The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

As is evident from the text of the rule, facts or data relied upon by an expert in reaching an opinion may include hearsay and may be admitted for the limited purpose of explaining the basis of that opinion. *Ellsworth*, 303 Md. at 603, 495 A.2d 348. Mr. Mathews submitted affidavits by his experts attesting that they had relied on the examiner's report in reaching their opinions concerning the nature and risks of the DBSI TICs and that the report was the type of document typically relied upon by experts in their respective fields.[54] The expert witness report of one of the experts explained in some detail how he relied upon the report in reaching the conclusion that the TIC interests are securities.

The record is ambiguous as to whether the Circuit Court actually ruled on this issue. There was almost no argument on the subject, no discussion of specific anticipated expert testimony referring to the report, and no discussion of reasonableness of the experts' reliance on the report. We decline to provide an advisory opinion on this limited record. It will be the task of the trial court on remand to evaluate the proffered expert testimony and make a determination whether the expert's reliance on the report is reasonable. *See Univ. of Md. Med. Sys. Corp. v. Waldt*, 411 Md. 207, 237, 983 A.2d 112

---

54. Of course, the use of the report by an expert cannot be simply a vehicle to circumvent the hearsay rule to admit otherwise inadmissible hearsay. The expert opinion testimony must be relevant to some issue in the case and, as the rule indicates, the portion of the report used by the expert must be of a nature reasonably relied upon by experts in the field.

(2009) (determination of whether expert testimony is sufficiently reliable is subject to abuse of discretion review).

## Conclusion

In sum, we hold as follows:

1. The undisputed facts demonstrate that the DBSI TICs purchased by Mr. Mathews are "securities" for purposes of the Maryland Securities Act.

2. Mr. Mathews' claims under the Securities Act are barred by limitations as a matter of law insofar as they relate to registration under the Act. Insofar as his claims under the Securities Act relate to alleged fraud and misrepresentation by the defendants, or by others for which the defendants may be liable, it was premature to award summary judgment on the basis of limitations.

3. It was also premature to award summary judgment as to Mr. Mathews' common law tort claims on limitations grounds as a matter of law based on the record to date.

4. We decline to affirm the award of summary judgment on an alternative ground that the Circuit Court did not adopt.

5. The DBSI bankruptcy examiner's report is not admissible under Rule 5–803(8), but may be admissible under Rule 5–803(24) and may be an appropriate basis for an expert opinion at trial under Rule 5–703. The Circuit Court appropriately reserved judgment on the admissibility and use of a bankruptcy examiner's report until it had additional information concerning the proposed use of the report in the context of the trial.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE SPLIT EQUALLY BY THE PARTIES.