*Young Electrical Contractors, Inc. v. Dustin Construction, Inc.*
No. 8, September Term 2017


**Contracts – Interpretation – Construction Contracts – Conditional Payment Provisions.**  A contract between a general contractor and a subcontractor on a construction project may typically contain a provision that relates the payments to be made by the general contractor to the subcontractor to the payments to be made by the project owner to the general contractor.  In some instances, such provisions are interpreted to govern only the *timing* of the general contractor's payments to the subcontractor and not the *obligation* of the general contractor to pay the subcontractor.  Such provisions are sometimes referred to as pay-*when*-paid clauses.  Other provisions include language making the owner's payment of general contractor a condition precedent for the general contractor's obligation to pay the subcontractor and *shift the risk* of the owner's non-payment from the general contractor to the subcontractor.  They are sometimes called pay-*if*-paid clauses.

**Civil Procedure – Summary Judgment.**  In a breach of contract case in a Maryland circuit court concerning a construction contract governed by Virginia law, the trial court erred as a matter of law in awarding summary judgment in favor of a general contractor against a subcontractor based upon a pay-if-paid clause in the subcontract because that clause did not necessarily apply to the damages sought in the action.  Applying Maryland procedural law, the Court of Appeals declined to affirm the award of summary judgment on alternative grounds, as the trial court would not have been required to award summary judgment on the alternative grounds.

Circuit Court for Montgomery County
Case No. 381002V
Argument: October 6, 2017

IN THE COURT OF APPEALS
OF MARYLAND

No. 8

September Term, 2017

_____

YOUNG ELECTRICAL CONTRACTORS, INC.

V.

DUSTIN CONSTRUCTION, INC.
_____

Barbera, C.J.,
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.
_____

Opinion by McDonald, J.
_____

Filed: May 24, 2018

In a typical scenario in the construction industry, the owner of a construction project enters into a prime contract with a general contractor to erect or renovate a building. The general contractor then enters into subcontracts with suppliers and trade contractors, such as plumbers and electricians, to provide materials or to perform portions of the work. For various reasons, the owner of the project may later be unable or unwilling to pay the general contractor under the prime contract. What this means for the subcontractor depends on the terms of its subcontract with the general contractor.

A subcontract may contain a provision that relates payment of the subcontractor by the general contractor to the payment of the general contractor by the project owner. Some provisions, sometimes called pay-*when*-paid clauses, concern the *timing* of payment by the general contractor, but do not relieve the general contractor of its liability to the subcontractor under the subcontract. Other provisions, sometimes called pay-*if*-paid clauses, make the project owner's payment of the general contractor a condition precedent of the general contractor's obligation to pay the subcontractor and thus can relieve the general contractor of liability to the subcontractor, even though the subcontractor has fully performed its part of the subcontract.

This case concerns the propriety of an award of summary judgment in favor of a general contractor against a subcontractor based on a pay-if-paid clause. The subcontractor, Petitioner Young Electrical Contractors, Inc., sued the general contractor, Respondent Dustin Construction, Inc., in the Circuit Court for Montgomery County for breach of contract relating to a construction project in Virginia. Applying Virginia law, the Circuit Court held that a pay-if-paid provision in the subcontract applied to the damages

sought in the action, determined that there was no dispute that the owner of the project had not paid the general contractor with respect to the matters in issue, and awarded summary judgment in favor of the general contractor. The Court of Special Appeals affirmed that decision, although for slightly different reasons.

We hold that the pay-if-paid clause relied upon by the Circuit Court, which was cited by neither party in motion papers or argument concerning summary judgment, does not necessarily apply to the issues in this case. Moreover, consistent with Maryland law concerning review of awards of summary judgment, we decline to seek other reasons to affirm the Circuit Court's decision. Accordingly, we vacate the judgment of the Court of Special Appeals and remand the matter to the Circuit Court for further factual development.

# I

## Background

### A.      *"Pay - When - Paid" and "Pay - If - Paid" Clauses*

In a typical construction project, the owner of the project contracts with a general contractor to carry out the project. The general contractor then enters into contracts with various suppliers and trades – the subcontractors – to provide the materials and carry out the actual construction. There is no necessary linkage between a subcontractor's or supplier's entitlement to compensation for performing a subcontract and the owner's performance of its obligations – primarily payment of the general contractor – under the prime contract. Thus, in the absence of an agreement to the contrary, a subcontractor that has completed its work is entitled to be paid regardless of whether the general contractor

2

has been paid by the project owner. *See* J. Acret & A.D. Perrochet, Construction Litigation Handbook 3rd, §4.4.

During the latter half of the twentieth century, general contractors began to include contingent payment provisions in their subcontracts. Although there apparently was no standard language, such a clause would typically provide that the general contractor was not obligated to pay the subcontractor until some specified number of days after the general contractor received payment under the prime contract from the owner of the project. Thus, for example, a window distributor that entered into a subcontract to supply windows for a project would not necessarily receive payment upon delivery of the windows, but would be required to await payment of the general contractor by the owner of the project.

Such clauses could be viewed as creating two different types of conditions. One interpretation of such a clause would view it simply as a timing provision – *i.e.*, it permits the general contractor to delay payment of the subcontractor until after it receives payment from the owner or (if that does not occur) some other period deemed reasonable, but does not relieve the general contractor of its obligation to compensate the subcontractor for its work. This interpretation might be viewed as a subcontractor-friendly version of the clause, as it considers the provision to govern *when*, but not *whether*, the subcontractor is to be paid by the general contractor.

Another interpretation of such a clause would view it as a condition precedent for payment of the subcontractor – *i.e.*, if the general contractor is not paid by the project owner under the prime contract, then the general contractor is not obligated to pay the subcontractor under the subcontract. In such a view, the subcontractor has not only agreed

3

to provide materials or to perform work on the project, but is also providing the general contractor with a sort of insurance against the risk of non-payment by the owner – a risk usually associated with insolvency or bankruptcy of the owner. This might be viewed as a general contractor-friendly version of the clause.

Although the nomenclature used in the case law and legal literature has not been consistent, for purposes of this opinion we shall distinguish between these two types of clauses by adopting the terminology used in a number of recent cases.[1] We shall refer to a provision that creates a timing condition as a "pay-when-paid" clause. We shall refer to a provision that creates a condition precedent for the obligation to pay as a "pay-if-paid" clause." As is often the case, when there is a dispute as to whether a particular contract provision falls into one category or the other, the devil is in the details.

This case will require us to apply the law of Virginia to construe a subcontract and prime contract. To put that law in perspective, we review briefly the evolution of judicial treatment of such clauses.

*The Majority Approach*

Under what has frequently been described as the majority approach,[2] a court will construe such a clause narrowly and interpret it to be a payment timing provision – *i.e.*, a

---

[1] *See, e.g.*, *Sloan & Co. v. Liberty Mutual Ins. Co.,* 653 F.3d 175, 180 (3d Cir. 2011); *Transtar Elec., Inc. v. A.E.M. Elec. Servs. Corp.*, 16 N.E.3d 645, 648-49 (Ohio 2014); *Lemoine Co. of Alabama v. HLH Constructors, Inc.*, 62 So.3d 1020, 1027 (Ala. 2010); *see also* R.F. Carney & A. Cizek, *Payment Provisions in Construction Contracts and Construction Trust Fund Statutes: A Fifty-State Survey*, 24 Construc. Law. 5 (Fall 2004).

[2] *See, e.g., Galloway Corp. v. S.B. Ballard Const. Co.* 464 S.E.2d 349, 354 (Va. 1995); *see also* M. Alsbrook, *Contracting Away an Honest Day's Pay: An Examination of*

pay-when-paid clause – unless the language of the provision clearly and necessarily creates a risk-shifting provision – *i.e.*, a pay-if-paid clause.

The leading case is *Thos. J. Dyer Co. v. Bishop International Engineering Co.*, 303 F.2d 655 (6th Cir. 1962). In that case, a general contractor entered into a subcontract with a plumbing subcontractor to install plumbing for a construction project at a race track. The plumbing subcontractor provided the services required by the subcontract, but there were cost overruns due to additional work requested by the owner and general contractor, some of which was outside the scope of the prime contract. When the plumbing subcontractor sought payment for the additional work, the general contractor declined because it had not been paid by the owner, which had become insolvent and filed for bankruptcy. The general contractor relied on language in the subcontract stating "no part of [payment] shall be due until five (5) days after Owner shall have paid Contractor[.]"

The Sixth Circuit observed that the "crucial issue" in the case was "whether … [the contract provision] … is to be construed as a conditional promise to pay, enforceable only when and if the condition precedent has taken place [*i.e.*, a pay-if-paid provision] … or … is to be construed as an unconditional promise to pay with the time of payment being postponed until the happening of a certain event, or for a reasonable period of time if it develops that such an event does not take place [*i.e.*, a pay-when-paid provision]." 303 F.2d at 659.

---

*Conditional Payment Clauses in Construction Contracts*, 58 Ark. L.Rev. 353, 354, 370-72 (2005); W.M. Hill & D.M. Evans, *Pay When Paid Provisions:  Still a Conundrum*, 18 Construc. Law. 16 (April 1998).

5

While the *Dyer* court conceded that the expressed intention of the parties ultimately governed the interpretation of a particular provision, it observed that courts had generally viewed such clauses as timing, rather than risk-shifting, provisions unless the contract language clearly indicated otherwise. After reviewing case law in Ohio and Kentucky concerning conditional payment clauses, the court concluded that "[t]he tendency of the courts is to hold that, unless the contract shows clearly that such an action is an express condition, the provision with reference to such act is inserted in order to fix the time of performance, but not to make the doing of such act or the happening of such event a condition precedent. If this is the intention of the parties, the fact that such act is not performed or that such event does not happen, does not discharge the contract, and the act which the parties agree to do upon the performance of such act or upon the happening of such event, is to be performed in at least a reasonable time." 303 F.2d at 660 (internal citations and quotations omitted).

The *Dyer* court rooted its analysis in its understanding of risk-sharing in the construction industry. The court considered it "basic in the construction business" for the general contractor to expect to be paid in full because it is "a fundamental concept of doing business[.]" 303 F.2d at 660. Although the "solvency of the owner is a credit risk necessarily incurred by the general contractor," various mechanisms such as installment payments and liens are designed to keep those risks to a minimum. The court went on to explain that these issues are "even more pronounced in the case of a subcontractor, whose contract is with the general contractor, not with the owner." *Id.* The court observed that, while a subcontractor might be dependent on the solvency of the general contractor,

6

normally the insolvency of the owner would not defeat the subcontractor's claim against the general contractor. Thus, "in order to transfer this normal credit risk [related to the owner] ... from the general contractor to the subcontractor, the [subcontract] should contain an express condition clearly showing that to be the intention of the parties." *Id.* at 660-61.

In the case before it, the Sixth Circuit ultimately concluded that the language of the subcontract did not indicate that the plumbing subcontractor intended to bear the burden of the owner's insolvency and, accordingly, the appellate court affirmed the trial court's judgment in favor of the plumbing subcontractor. *Id*. at 661. ("To construe [the provision] as requiring the subcontractor to wait to be paid for an indefinite period of time until the general contractor has been paid by the owner, which may never occur, is to give to it an unreasonable construction which the parties did not intend at the time the subcontract was entered into.").

The majority approach appears to be based, at least in part, on a general principle that disfavors construing a contract provision to effect a forfeiture, particularly when the condition precedent is outside the control of the party at risk of forfeiture. *See* Restatement (Second) of Contracts, §227(1) (March 2018 update) ("In resolving doubts as to whether an event is made a condition of an obligor's duty … an interpretation is preferred that will reduce the obligee's risk of forfeiture, unless the event is within the obligee's control or the circumstances indicate that he has assumed the risk"). In the context of a subcontract for a construction project, this principle favors construing a conditional payment provision as a timing provision rather than a risk-shifting provision. *Id*., *illustration* 1 (describing example apparently based on *Dyer* case).

*Pay-if-Paid Clause as against Public Policy*

In some jurisdictions there is more than a preference for construing conditional payment clauses as timing provisions. In those jurisdictions, there is a view that the transfer of risk effected by a pay-if-paid clause in a construction subcontract is contrary to public policy. At least two state courts have held that such a clause, even if explicitly set out in a subcontract, is void as against public policy. *See West-Fair Elec. Contractors v. Aetna Cas. & Sur. Co.*, 661 N.E.2d 967, 970 (N.Y. 1995) (holding that pay-if-paid clause was inconsistent with state legislature's enactment of mechanic's lien statute to protect "those who furnish work, labor and services or provide materials for the improvement of real property"); *William R. Clarke v. Safeco Ins. Co.*, 938 P.2d 372, 373-74 (Cal. 1997) (citing *West-Fair* and stating similar rationale); *but see Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 785-87 (Ky. 2018) (declining to adopt public policy rationale in light of state's long tradition of freedom of contract). In addition, the legislatures in several states have enacted statutes declaring such clauses to be void. *See* R.F. Carney & A. Cizek, *Payment Provisions in Construction Contracts and Construction Trust Fund Statutes: A Fifty-State Survey*, 24 Construc. Law. 5 (Fall 2004); M. Alsbrook, *Contracting Away an Honest Day's Pay: An Examination of Conditional Payment Clauses in Construction Contracts*, 58 Ark. L.Rev. 353, 379-83 (2005).

*Maryland Case Law*

Although the contract in this case is not governed by Maryland law, the Virginia Supreme Court has referenced Maryland law in its own analysis of conditional payment

8

clauses. In order to fully understand Virginia law, it is useful to review the Maryland decisions on which it is partly based.

This Court has relied upon, and quoted at length from, the *Dyer* decision in resolving a payment dispute between general contractor and a subcontractor when a project owner has not fully paid the general contractor. *See Atl. States Const. Co. v. Drummond & Co.*, 251 Md. 77, 81-84 (1968); *Fishman Constr. Co. v. Hansen*, 238 Md. 418, 422-23 (1965). Consistent with *Dyer*, this Court has stated that such provisions are to be construed as timing provisions – pay-when-paid clauses – unless the contract language clearly indicates that the parties intended otherwise.

In a decision later relied upon by the Virginia Supreme Court, the Court of Special Appeals considered what language would suffice to shift the risk of owner insolvency from the general contractor to the subcontractor. *Gilbane Bldg. Co. v. Brisk Waterproofing Co.*, 86 Md. App. 21 (1991). In that case, a masonry subcontractor had completed all of the work required under its subcontract on a residential condominium project. The general contractor refused to make the final payment that was due to the subcontractor because the general contractor had not received a payment from the project owner. After the masonry subcontractor's mechanic's lien on the property had been extinguished as a result of the project owner's bankruptcy, the masonry subcontractor sued the general contractor for payment.

In declining to pay the masonry subcontractor, the general contractor had relied on a subcontract provision which stated, in pertinent part, that "*[i]t is specifically understood and agreed that the payment to the trade contractor is dependent, as a condition precedent,*

9

*upon the construction manager receiving contract payments, including retainer from the owner.*"  86 Md. App. at 25 (emphasis added in original).  The Court of Special Appeals concluded that the reference in the subcontract to owner payment as a "condition precedent" was sufficient to shift the risk of owner insolvency to the masonry subcontractor as a matter of objective contract interpretation, regardless of whether the parties had actually discussed the risk of owner insolvency during their negotiations.  *Id*. at 28.

*Virginia Case Law*

In 1995, the Virginia Supreme Court addressed for the first time the distinction between pay-when-paid and pay-if-paid clauses and whether a particular subcontract provision shifted the risk of owner default from the general contractor to the subcontractors.  *Galloway Corp. v. S.B. Ballard Const. Co*., 464 S.E.2d 349 (Va. 1995).  That case arose from the construction of a commercial office complex in downtown Norfolk, Virginia.  The general contractor had entered into various subcontracts with suppliers of labor and materials, all of which contained a provision stating that "[t]he Contractor shall pay the Subcontractor each progress payment within three working days *after the Contractor receives payment from the Owner*."  464 S.E.2d at 352 (emphasis added in original).  Each subcontract contained similar language with respect to the final payment due to each subcontractor.  *Id*.

Work had progressed on the project for nearly two years, when the project owner encountered financial difficulties in the midst of construction.  After the owner failed to make three progress payments to the general contractor, construction stopped and lawsuits began.  464 S.E.2d at 352.  The subcontractors recovered some of the compensation due

10

them through the satisfaction of mechanic's liens on the project, and sought to recover the remainder through a breach of contract action against the general contractor. The general contractor relied on the payment clause to defend itself from the subcontractors, arguing that it was not liable to the subcontractors because it had not been paid by the owner. *Id.* at 353. The trial court ruled in favor of the subcontractors, concluding that the payment clause in the subcontracts concerned the timing of payment and did not relieve the general contractor of its liability to the subcontractors.

On appeal, the Virginia Supreme Court came to a more nuanced conclusion. It discussed the *Dyer* case at some length and opined that the Sixth Circuit decision was "sound and in concert with traditional notions of the freedom to contract." 464 S.E.2d at 354. It regarded the *Dyer* case as dealing with contract language that, on its face, reasonably contemplated eventual payment of the subcontractor. The Virginia court contrasted the contract language in *Dyer* with that in Court of Special Appeals' *Gilbane* decision, which it regarded as an equally clear example of an instance in which the parties intended to establish a condition precedent to the general contractor's liability. *Id.*

In the case before it, however, the Virginia Supreme Court concluded that the contract language was not as clear as in either *Dyer* or *Gilbane*. The Court said "there is no additional language here which would permit us to find that the parties contemplated payment 'within a reasonable time[,]'" as it understood the provision in *Dyer*. Unlike *Gilbane*, "nothing in the contracts would permit us to find ... that the parties clearly understood these terms to assert a condition precedent on payment." 464 S.E.2d at 355. As a result, the Virginia Supreme Court concluded that "the phrases 'after the Contractor

11

receives payment from the Owner' and 'has received payment from the Owner' constitute latent ambiguities in the contracts." *Id*. Because the clauses were latently ambiguous, the court relied on parol evidence to determine the intent and understanding of the parties. It concluded that the general contractor had intended to create a pay-if-paid clause and then assessed the testimony of the various subcontractors at trial as to whether each had the same understanding. The court ultimately concluded that four of the five subcontractors shared the general contractor's understanding of the clause and that the clause was a basis for the general contractor's defense as to the claims of those subcontractors. It therefore reversed the trial court's ruling as to those subcontractors and upheld the judgment in favor of the fifth subcontractor. *Id.* at 356.

*Summary*

While a minority of jurisdictions regard pay-if-paid clauses as void as against public policy, the majority approach is to recognize both "pay-when-paid" and "pay-if-paid" clauses, with some preference given to construing such a clause as a timing rather than a risk-shifting provision. To distinguish one from the other under Virginia law, a court is to look first to the language of the provision. If the language appears to contemplate that the subcontractor will ultimately be paid, the provision will be construed as a pay-when-paid clause. If the contractual language clearly sets forth owner payment as a condition precedent to the general contractor's liability to the subcontractor, as in *Gilbane*, it will be construed as a pay-if-paid clause. If the language contains a latent ambiguity, the court looks to parol evidence to determine the intent of the parties.

***B.   Facts and Proceedings***

The record in this case discloses the following facts, which are in many respects undisputed, and the resulting legal proceedings that have led to this appeal.

*The Prime Contract*

This case arose out of a construction project undertaken by George Mason University ("George Mason" or "Owner"), a Virginia state university located in Fairfax, Virginia, to renovate a student union building (the "Project"). On July 20, 2010, George Mason contracted with Dustin Construction Inc. ("Dustin" or "Contractor"), a general contractor based in Ijamsville, Maryland, to conduct the renovation ("the Prime Contract"). The Prime Contract consisted of a three-page document setting out the particulars of the Project that was signed by representatives of George Mason and Dustin. That document incorporated various other documents, including a 49-page form attachment setting forth, in 50 multi-part sections, standard general contract terms approved by the Virginia Department of General Services for state government construction contracts.[3]

A few days later, on July 30, 2010, George Mason issued a "Notice to Proceed" with the Project to Dustin. Although the Prime Contract stated a "Substantial Completion" date of November 15, 2010,[4] the Notice to Proceed set forth a substantial completion date of November 30, 2010. The record does not explain this discrepancy.

_____

[3] While the record includes a copy of the standard Virginia procurement terms and conditions, it does not include the various other documents that were incorporated in the Prime Contract.

[4] Under the standard Virginia state contract terms, "Substantial Completion" – as distinct from "Final Completion" – means "[t]he condition when the Owner agrees that the

*The Electrical Subcontract*

To accomplish certain electrical work required under the Prime Contract, Dustin subcontracted with Young Electrical Contractors Inc. ("Young" or "Subcontractor"), an electrical subcontractor based in Laurel, Maryland, to perform that work. Dustin gave Young notice to proceed as a subcontractor on August 5, 2010, although Dustin and Young did not enter into a written contract until October 15, 2010 ("the Subcontract").[5] The Subcontract provided that Dustin would pay Young $1,148,860 for satisfactory completion of the work required by the Subcontract. Subcontract, §2.

The written Subcontract included a section concerning change orders. Subcontract, §13. That section defined a change order as "a written order … signed by the Contractor … authorizing a change in the Work or an adjustment in the Subcontract Sum or Subcontract Time." Among other things, that section provided that the Subcontract Sum or Subcontract Time could be changed only by a change order and permitted the Subcontractor to request an "equitable adjustment" of the Subcontract Sum or Subcontract Time via change order. Subcontract, §13(a), (c).

_____

Work, or a specific portion thereof, is sufficiently complete, in accordance with the Contract Documents, so that it can be utilized by the Owner for the purposes for which it was intended…."

[5] The parties appear to agree that the Subcontract was entered into on October 15, 2010 – and the Subcontract itself recites that it was "made as of October 15, 2010" – although a number of later dates appear on the document. The written Subcontract was stamped as "entered" with a date of December 29, 2010. Young's representative apparently signed the written contract on December 10, 2010; Dustin's representative executed it on December 22, 2010.

As we shall see, the Subcontract also contained three provisions that might be considered conditional payment clauses of one kind or another and that have played a prominent role in this litigation. Subcontract, §§2(c), 13(c), 27(f).

*Delay and Change Requests*

Young's work on the Project was not substantially completed until March 8, 2011, three months beyond the substantial completion date (November 30, 2010) set by George Mason in the Notice to Proceed. The record is not clear on the precise cause or causes of the delay or the extent to which it involved only electrical work or other aspects of the Project.

As permitted under the Subcontract, Young submitted change requests to Dustin based on increased costs. In those change requests, Young asked Dustin to issue change orders increasing the Subcontract Sum by specified amounts. It appears from the record of this case that the Subcontract Sum was increased from the original $1,148,860 for various reasons that Young described in one of its change requests as "owner initiated due to design changes, design errors, unforeseen conditions and additions/deletions of the work originally required." According to Young, these changes resulted in "excessive management time by the project management team, a constant interruption in the job flow, lower labor productivity, an excessive amount of rework of work already installed, plus a serious negative cash flow due to the changes needed to be negotiated but the work being needed as the contract work was being installed." As a result, the Subcontract Sum was apparently increased by $317,193.

15

Two change requests submitted by Young that did <u>not</u> result in changes to the Subcontract Sum are at issue in this case: Change Request 1066 and Change Request 1067.[6]

Young submitted Change Request 1066 to Dustin on September 14, 2011. That change request asked Dustin to issue a change order increasing the Subcontract Sum by $259,034.99 for "extended overhead costs associated with [George Mason]'s extension of the contract" past the original substantial completion date. Attached to the change request was a listing of various overhead expenses comprising the change request. It is not clear from the record whether Dustin responded to Young contemporaneously in any way. More than a year later, on November 16, 2012, Dustin submitted Change Request 1066 to George Mason along with Dustin's own delay claim.[7] At George Mason's request, Dustin subsequently separated Change Request 1066 from Dustin's own claim, reduced the amount requested in Young's Change Request 1066 to $180,010.21, and resubmitted it to George Mason on March 4, 2013 – denominated as Dustin's Proposed Change Order 135.

On February 15, 2013, Young submitted Change Request 1067 to Dustin. In that change request, Young asked Dustin to issue a change order increasing the Subcontract Sum by $274,812.33 for additional costs associated with delay and disruption, among other

_____

[6] A third change request, denominated Change Request 1047, was originally at issue in this case, but was resolved when Dustin paid Young the amount requested in February 2014 while this case was pending in the Circuit Court.

[7] The record does not indicate why Dustin delayed submitting this proposal to George Mason or whether it informed Young when it submitted the proposed change order.

reasons, which, Young said, were not attributable to Young.  Attached to the change request was a breakdown of Young's costs and a narrative description of the causes of those costs.  The narrative included the description quoted above concerning prior approved increases in the Subcontract Sum.  The narrative went on to describe issues with sequencing the work, requests for information, changes to the work, excessive down time, and lack of negotiation.  Again, it is not clear from the record whether Dustin responded directly to Young concerning Change Request 1067.  However, approximately a month later, on March 19, 2013, Dustin submitted its Proposed Change Order 136 to George Mason, which incorporated Young's Change Request 1067.  Again, it is not clear from the record what, if any, information Dustin shared with Young concerning this submission.

*Young sues Dustin*

Five months later, on September 3, 2013, while the two change requests were apparently still pending with George Mason, Young filed a complaint against Dustin in the Circuit Court for Montgomery County.  The complaint consisted of a single count alleging that Dustin had breached the Subcontract.

Young's complaint asserted that Dustin was responsible for "scheduling and sequencing of the trades" and for administration of the Prime Contract with George Mason, that Dustin had directed Young to perform additional work, and that Young was not responsible for the delay in achieving substantial completion of the work.  Young further alleged that, because of the delays in the Project, Young had been directed to work overtime and had incurred additional costs.  Young further contended that it had submitted its claims arising from the additional work to Dustin, that Dustin was required by the Subcontract to

17

submit the claims to George Mason "if [Dustin] considered that the claims arose due to [George Mason]'s actions or inactions," that there was no indication that Dustin had submitted the claims to George Mason, and that Dustin had therefore waived the right to assert that the claims were not its own responsibility. The complaint concluded that Dustin had breached the Subcontract by (1) failing to coordinate and sequence the work, (2) directing additional work and overtime that it failed to pay for, and (3) not paying the costs of the extended period of contract performance.

*George Mason Rejects Change Request 1066*

On September 17, 2013, shortly after Young's complaint had been filed, George Mason rejected Dustin's Proposed Change Order 135, which incorporated Young's Change Request 1066. There appears to be some dispute, or at least uncertainty, as to whether George Mason also rejected Change Request 1067 at the same time. In the Circuit Court, Dustin submitted an affidavit of its project manager stating that George Mason rejected Change Request 1067 at the same time it rejected Change Request 1066, but the documentation submitted together with the affidavit does not appear to support that statement.[8] In any event, there appears to be no dispute that Dustin was not paid by George

_____

[8] At the hearing in the Circuit Court, Dustin's counsel stated that Dustin had "bundled" Change Request 1066 and Change Request 1067 into one proposed change order – 136 – which George Mason rejected. However, from the documents submitted in connection with the summary judgment motion, it appears that Dustin submitted two separate proposed change requests to George Mason – 135 and 136 – corresponding to Young's change requests and that one – 135 – was rejected by George Mason. It is perhaps also notable that other statements made in the project manager's affidavit – that Young had not provided notice that it would submit change requests – were retracted by Dustin when Young submitted documentation that it had in fact given notice. For its part, Young contended that George Mason's rejection – whatever it covered – did not constitute a

18

Mason with respect to its proposed change orders based on Young's Change Requests 1066 and 1067. It is also undisputed that Dustin did not pay Young the amount sought in either of those change requests.

*Dustin's Motion for Summary Judgment*

On October 21, 2013, one and a half months after this action had commenced and one month after George Mason rejected Dustin's proposed Change Order 135, Dustin filed a motion for summary judgment together with its answer to the complaint. In its summary judgment motion, Dustin argued that its "core, dispositive defense" was that Young had failed to make its claims on a timely basis. Dustin quoted §13(c)[9] of the Subcontract concerning changes. In particular, it argued that Young had failed to comply with notice requirements that the Virginia Supreme Court had held were to be strictly construed. Dustin initially submitted a supporting affidavit attesting, in part, to a lack of notice, but later retracted that testimony. Ultimately, the Circuit Court did not resolve the case on the timeliness of notice issue raised by Dustin and that issue is not before us.

Quoting the same provision of the Subcontract, Dustin also argued that it was not liable to Young for the amounts sought in the two change requests because George Mason

---

"denial" under §47 of the standard Virginia government conditions incorporated in the Prime Contract. Given our disposition of this appeal, the questions as to whether, when, and how George Mason rejected the two change requests can be sorted out during discovery after remand.

[9] In the memorandum accompanying its motion, Dustin repeatedly cited §13(a), but it is clear from its argument and the quotation in its memorandum that it was actually referring to §13(c) of the Subcontract.

19

had denied its proposed change orders based on those requests and thus a condition precedent for Dustin's liability to Young – payment by George Mason – was not satisfied.

Section 13(c) of the Subcontract states:

> In the event a change is made to this Contract as a result of the Owner's change to the Prime Contract and such change causes an increase or decrease in the cost of and/or the time required for performance under this Subcontract, Subcontractor may submit to Contractor in writing in accordance with the requirements of the Changes Clause of the General Contract a request for an equitable adjustment in the Subcontract Sum and/or the Subcontract Time, or both, within ten (10) calendar days from the date of receipt by Subcontractor of notification from Contractor of the change or such lesser time as is required to permit Contractor to comply with the terms of the Prime Contract. Contractor shall pay to Subcontractor that amount paid by the Owner to Contractor on account of any such change to this Subcontract, less any markup and other amounts due Contractor on account of such change. Contractor shall have no liability to Subcontractor on account of any such Owner initiated change except for such amount, if any.

Dustin pressed a similar argument under §27(f) of the Subcontract, which is entitled "Resolution of Disputes Involving Owner." Section 27(f) states:

> Contractor shall have no liability to Subcontractor on account of any claim, suit or appeal arising under or relating to the Prime Contract or the Owner's conduct thereunder except that recovered by the Contractor from the Owner on Subcontractor's behalf, if any, less any markups and other amounts due Contractor on account of such claim, suit or appeal.

Although neither clause contains the phrase "condition precedent," in Dustin's view, the two provisions of the Subcontract nevertheless functioned as risk-shifting provisions – pay-

20

if-paid clauses – and conditioned its liability to Young on Dustin's receipt of payment from George Mason.[10]

*The Circuit Court Awards Summary Judgment*

On January 22, 2014, prior to any discovery in the case, the Circuit Court held a hearing at which it heard legal argument on Dustin's summary judgment motion. At the hearing, Dustin relied primarily on its argument that Young's claims were precluded by §13(c) of the Subcontract. Young countered that discovery was necessary before it could be said that it was undisputed that the claims were the result of changes initiated by George Mason.

The Circuit Court took the matter under advisement that day, and delivered an oral decision at a continuation of the hearing on February 11, 2014. In its oral opinion, the Circuit Court explained that its review of the record demonstrated that Dustin had submitted both change requests to George Mason. In addition, the court held that summary judgment in Dustin's favor was appropriate because George Mason had not paid Dustin for either request. The Circuit Court did not attempt to resolve whether George Mason had rejected the second proposed change order (involving Young's Change Request 1067). The court said that it was irrelevant to its determination whether or not George Mason had actually denied both change requests as Dustin had not received payment for them from George Mason.

---

[10] Dustin also asserted that Young had not followed the Subcontract's dispute resolution process. That issue was not ruled on below, and is not before us.

21

The Circuit Court's decision was based not on §13(c) or §27(f) of the Subcontract – the provisions on which Dustin had based its summary judgment motion – but rather on §2(c) of the Subcontract and §37(a)(1) of the standard Virginia terms incorporated in the Prime Contract between George Mason and Dustin. (Neither party had mentioned §2(c) of the Subcontract or §37(a)(1) of the standard conditions in their motion papers or addressed those provisions at oral argument.)

Section 2(c) of the Subcontract reads, in pertinent part, as follows:

> Contractor's obligation to pay all or any portion of the Subcontract Sum to Subcontractor, whether as a progress payment, retainage or final payment, is contingent, *as a condition precedent*, upon the Contractor's receipt of payment from the Owner of all amounts due Contractor on account of the portion of the Work for which the Subcontractor is seeking payment.

Subcontract, §2(c) (emphasis added). As is evident, that subsection of the Subcontract contains the magic phrase "condition precedent" that the Virginia Supreme Court had declared in *Galloway* to be a clear expression of a risk-shifting pay-if-paid clause.

The other provision cited by the Circuit Court – Section 37(a)(1) of the standard conditions incorporated in the Prime Contract between George Mason and Dustin – is one of the standard terms in Virginia state government contracts. It references a Virginia statute[11] that requires a contractor in a Virginia state contract to pay a supplier or subcontractor within seven days of receiving payment from the owner of a project or to notify the state agency and the supplier or subcontractor why payment is being withheld.

_____

[11] Virginia Code, §2.2-4354.

22

The Circuit Court signed a written order granting summary judgment in favor of Dustin that same day. Young moved for reconsideration, which the Circuit Court denied on April 3, 2014. Young timely noted its appeal.

*The Court of Special Appeals Affirms*

On October 3, 2016, the Court of Special Appeals affirmed the Circuit Court's grant of summary judgment in an unreported opinion. Like the Circuit Court, the intermediate appellate court relied on §2(c) of the Subcontract, but also referred to §13(c) and §27(f) – the provisions pressed by Dustin – after it concluded that there was no dispute that George Mason had initiated the changes for which Young sought payment. At the request of Dustin, the Court of Special Appeals re-issued its decision on December 28, 2016, as a reported opinion. 231 Md. App. 353 (2016). The reported opinion was identical to the original version of the opinion with the addition of a footnote that stated the Subcontract provided a mechanism under which Young could have pursued compensation directly from George Mason instead of Dustin, if it had acted within six months of the denial of its change requests. 231 Md. App. at 359 n.4. The court cited §27 of the Subcontract and §47 of the standard Virginia state government contract terms in the Prime Contract in reaching this conclusion. Before us, both Dustin and Young agree, although for different reasons, that the analysis in this footnote is an incorrect interpretation of the contracts under Virginia law. In any event, the footnote in the Court of Special Appeals opinion appears to be dicta, unnecessary to its resolution of the case.[12]

---

[12] At oral argument before us, Dustin suggested alternative ways that Young could have pursued claims against George Mason. The merits of Dustin's suggestions are not

23

In its decision, the intermediate appellate court held that that there was no dispute as to any material fact, that all three payment provisions of the Subcontract were valid, and that they justified Dustin's refusal to accept Young's change requests. The intermediate appellate court first agreed with the Circuit Court that §2(c) was a pay-if-paid clause that made payment by George Mason to Dustin under the Prime Contract a condition precedent to payments by Dustin to Young under the Subcontract. 231 Md. App. at 363-64. However, it held that §13(c) was the payment provision "most relevant" to the current dispute and construed the language of §13(c) and §27(f), when read alone, to be pay-when-paid clauses similar to the provision at issue in *Dyer* rather than pay-if-paid provisions. *Id*. at 364-65. However, the intermediate appellate court reasoned that any payments covered by those provisions were also subject to the condition precedent set forth in §2(c), a pay-if-paid clause. *Id*. at 365-66. Accordingly, the Court of Special Appeals affirmed the Circuit Court's grant of summary judgment.

Young filed a petition for a writ of *certiorari*, which we granted on April 4, 2017.[13]

---

currently before us and, accordingly, we do not attempt to resolve whether Young could have pursued an alternative procedure under Virginia law for asserting its claims.

[13] Young originally sought a writ of *certiorari* on October 28, 2016. After we denied that petition, Young renewed its request when the Court of Special Appeals re-issued its decision as a reported opinion.

## II

## Discussion

The question before us is whether the Circuit Court properly granted summary judgment based on its determination that there were no disputed questions of material fact and that Dustin was entitled to judgment as a matter of law under the court's construction of the Subcontract in conjunction with the Prime Contract.[14]

### A.     *Governing Law and Standard of Review*

1.  Applicable Substantive Law

Contract interpretation is governed by the law of the place of contract or the law chosen by the parties.  *Cunningham v. Feinberg*, 441 Md. 310, 326 (2015).  The Subcontract here explicitly provides that it is to be governed by Virginia law.  Subcontract, §31.  The Prime Contract also explicitly incorporates various requirements imposed by Virginia statutes and regulations concerning Virginia state government procurement.

Virginia courts "review issues of contract interpretation *de novo*."  *Bailey v. Loudoun Cty. Sheriff's Office*, 762 S.E.2d 763, 766 (2014).  Like Maryland law, Virginia law applies an objective interpretation of a contract to discern what the parties intended. Virginia courts assume that each provision of a contract has a purpose, and must be read in context harmoniously with the other provisions.  *See, e.g.*, *TravCo Ins. Co. v. Ward*, 736

---

[14] Young raised several other issue in its petition for *certiorari*, which we need not address, in light of our decision on this question.

S.E.2d 321, 325 (Va. 2012). In interpreting contracts, the Virginia Supreme Court has stated:

> It is the function of the court to construe the contract made by the parties, not to make a contract for them. The question for the court is what did the parties agree to as evidenced by their contract. The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares.

*W.F. Magann Corp. v. Virginia-Carolina Electrical Works, Inc.,* 123 S.E.2d 377, 381 (Va. 1962) (citations omitted); *see also Wilson v. Holyfield*, 313 S.E.2d 396, 398 (Va. 1984) ("It is the duty of the court to construe a contract as written.").

2. Applicable Procedural Law

Although we look to another state's substantive law, the standard for summary judgment is governed by the law of the forum – in this case, Maryland law. *Goodwich v. Sinai Hosp. of Baltimore, Inc.*, 343 Md. 185, 204-207 (1996).

Under the Maryland Rules, a circuit court may grant summary judgment only if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Maryland Rule 2–501(f). The court is to consider the record in the light most favorable to the non-moving party and consider any reasonable inferences that may be drawn from the undisputed facts against the moving party. *Mathews v. Cassidy Turley Maryland, Inc.*, 435 Md. 584, 598 (2013). Because the circuit court's decision turns on a question of law, not a dispute of fact, we review a circuit court's decision to grant summary judgment without according deference to the circuit court's conclusions, or those of the intermediate appellate court. *Id.*

26

If we should reach a different conclusion than the circuit court on the basis on which it granted summary judgment, we ordinarily do not try to sustain the circuit court's decision on a different ground. *Mathews*, 435 Md. at 598. Such a course would interfere with the discretion that a trial court normally enjoys to deny, or defer until trial, the merits of summary judgment on a particular issue. *Id.* We may nonetheless affirm summary judgment on a different ground if the trial court would have no discretion as to the particular issue. *Id.*

**B.**     ***Whether Dustin was Entitled to Summary Judgment***

At the outset, we must confess that much in this case has left us scratching our head. To recap, Dustin initially sought summary judgment primarily on Young's alleged failure to give timely notice of its claims, later switched its flagship contention to the apparent decision of George Mason not to accept the change requests (a decision not fully documented in this record), and relied on §13(c), and to a lesser extent §27(f), as risk-shifting pay-if-paid clauses. The Circuit Court ruled in Dustin's favor, although not on the basis of the Subcontract provisions cited by Dustin, but rather on the basis of §2(c) of the Subcontract (a pay-if-paid clause), and §37(a)(1) of the standard Virginia conditions incorporated in the Prime Contract, neither of which had been mentioned by either party in the papers or argument on Dustin's summary judgment motion. The Court of Special Appeals, attempting to bridge this gap as best it could, affirmed on the basis of the provisions urged by Dustin (although it construed them to be pay-when-paid provisions), as well as those cited by the Circuit Court, and suggested that Young should have sued George Mason directly under §27 of the Subcontract and §47 of the standard conditions in

27

the Prime Contract – a suggestion that both Dustin and Young agree is an incorrect interpretation of the contracts.

And this is all in a context where we – like the trial court and intermediate appellate court – must not only decide the case based on Virginia (as opposed to Maryland) substantive law, but must decide a question that concerns Virginia *state government* procurement. It perhaps goes without saying that this is not in our wheelhouse.[15] So it is with some trepidation that we attempt to provide some clarity and, at the very least, do no harm.

We first consider whether Dustin was entitled to summary judgment for the reason given by the Circuit Court. We conclude that it was not and then go on to consider whether the Circuit Court would have been required to award summary judgment in Dustin's favor for the reason originally urged by Dustin.

1.      Whether Dustin was Entitled to Summary Judgment under §2(c)

The Circuit Court held that Dustin was entitled to summary judgment pursuant to §2(c) of the Subcontract and §37(a)(1) of the standard conditions in the Prime Contract because George Mason had not paid Dustin with respect to its proposed change orders based on the two change requests submitted to Dustin by Young.

Although Dustin itself had not raised §2(c) as a basis for summary judgment, it may have appeared to the Circuit Court to be a more straightforward route to that end. Section

---

[15] It is perhaps worth noting that we are seldom called upon to decide matters of Maryland state procurement, as the General Assembly has created a special forum for that task. *See* Maryland Code, State Finance & Procurement Article, §15-201 *et seq.*

2(c) contains the key phrase "condition precedent" in that it made the "Contractor's obligation to pay all or any portion of the Subcontract Sum to Subcontractor, whether as progress payment, retainage or final payment, … *contingent*, *as a condition precedent*, upon the Contractor's receipt of payment from the Owner of all amounts due Contractor on account of the portion for the Work for which the Subcontractor is seeking payment." Subcontract, §2(c) (emphasis added). Under the *Galloway* decision, this language clearly creates a pay-if-paid clause, which would appear to reduce the issue simply to whether George Mason had paid Dustin. The court thus would avoid having to determine whether the changes on which Change Request 1066 and Change Request 1067 were based were "owner-initiated," whether George Mason had ever rejected Change Request 1067,[16] whether George Mason had rejected Change Request 1066 in the appropriate manner, or whether Dustin was deficient in some way in seeking George Mason's approval, among other issues.

This Occam's Razor approach – preferring a simpler resolution over a complex resolution of a problem – seems a generally sensible approach. However, it does not work in this instance. Section 2(c) concerns payment of the Subcontract Sum – originally $1,148,860 and later increased by $317,193 through change orders. But those costs are not the subject of this case. For example, Change Request 1067 requested an additional

---

[16] The Circuit Court explicitly noted in its oral decision that it did not have to resolve this question.

$274,812.33 because of "additional costs associated with delay and disruption[,] none of which is attributable to Young."

Section 2(c) applies to "Contractor's obligation to pay all or any portion of the Subcontract Sum." Unlike the payment clauses in *Gilbane* and *Dyer*, this clause does not concern Dustin's contract liability to Young generally, but specifically payments to be made with respect to the Subcontract Sum. Thus, in order to decide whether §2(c) applies to the damages sought by Young, one must first determine whether the alleged damages are part of the Subcontract Sum. The notion that §2(c) would be "generally applicable" to all contract liability of Dustin is at odds with language of that section relating it to the Subcontract Sum and other provisions of the Subcontract related to particular types of damages.

In its complaint, Young alleged the following bases for its contention that Dustin had breached the subcontract: Dustin's alleged failure to coordinate and sequence work, Dustin's alleged direction to Young to perform additional work and uncompensated overtime, and Dustin's alleged failure to pay for the costs of the extended period of contract performance. At least some of these alleged damages appear to be outside the scope of §2(c). For example, Young's complaint seeks damages for delay that it attributes to Dustin and §39 of the Subcontract states that "Contractor [*i.e.*, Dustin] shall be liable for any and all actual damages sustained as a result of delay."[17] Even assuming that George Mason

---

[17] Two §39's appear in the Subcontract. The reference above is to the second section with that designation.

30

initiated changes, what is in dispute is who is responsible for the delays and incidental costs of *implementing* those changes.

Reading §2(c) to apply to all damages resulting from delay would establish a condition precedent that would bear no logical relation to those damages. For example, under the Prime Contract, Dustin is responsible for coordinating and sequencing the work. If the delay were attributable to a failure by Dustin to carry out that obligation, there is no reason why George Mason would pay Dustin for failing to carry out Dustin's own responsibilities under the Prime Contract. The same would be true for portions of Young's work that had to be redone because Dustin or one of its other subcontractors had destroyed Young's work. Section 28 of the Subcontract concerns disputes that do not involve the conduct of the Owner and, unsurprisingly, that provision does not include a pay-if-paid clause.[18] The general application of §2(c) to payments other than those related to the Subcontract Sum would transform it into a blanket waiver by a subcontractor of delay damages, something that appears to be contrary to the intent of the parties.

Young seeks other damages that are not necessarily related to delay, and that might be governed by §2(c). In particular, the complaint alleged "Dustin breached the contract . . . by directing the performance of additional work which it failed and refused to pay for, [and] by directing overtime work which it has failed and refused to pay for[.]" The record

---

[18] That provision sets forth certain alternative dispute mechanisms. Whether an award of such damages would be precluded by a failure to pursue those procedures is not before us.

31

before us is insufficient to say those matters are governed by a clause with a condition precedent, particularly where no discovery has been conducted.

The other provision relied upon by the Circuit Court in awarding summary judgment was §37(a)(1) of the standard Virginia procurement terms and conditions that were incorporated in the Prime Contract. However, as noted earlier, that provision simply set forth the requirements of the Virginia "prompt payment" statute. *See* Virginia Code, §2.2-4354. That statute requires Virginia state agencies to obligate their contractors to pay subcontractors promptly after the agency pays the contractor, or to notify the agency and subcontractor why it is not doing so. It is designed to ensure that subcontractors are paid without delay, not to create a pre-condition to their payment.[19] Thus, §37(a)(1) would not be a basis for awarding summary judgment in favor of Dustin in this case.

2. Whether the Circuit Court was Required to Award Summary Judgment for a Different Reason

We consider briefly whether the Circuit Court would have been required to award summary judgment in Dustin's favor on a basis other than §2(c) of the Subcontract and §37(a)(1) of the standard terms incorporated in the Prime Contract. The obvious basis to consider is the primary ground argued by Dustin before the Circuit Court: that the breach of contract claim made by Young was based on Owner-initiated changes and that §13(c)

---

[19] In this regard it appears to be similar to the Maryland prompt payment statute relating to State agency construction contracts. Maryland Code, State Finance & Procurement Article, §15-226; *see also* Maryland Code, Real Property Article, §9-301 *et seq*.

and §27(f) of the Subcontract are risk-shifting pay-if-paid clauses that preclude a judgment in favor of Young because George Mason has not paid Dustin with respect to that claim.

We cannot say that the Circuit Court would be required to resolve those issues in Dustin's favor as a matter of law on the current state of the record, as there appear to be open factual issues as to both elements of Dustin's argument. The ruling on the summary judgment motion in this case occurred prior to any opportunity for discovery and thus deprived the party opposing that motion of the opportunity to produce additional information relevant to the issues. *See Green v. H & R Block, Inc.*, 355 Md. 488, 502 & n.3 (1999). In this case, where certain issues relate to the possible responsibility of the Owner for changes and delays and the Owner's response to proposed change requests, and where, under the contract, Young did not deal directly with George Mason, discovery may well be important to determine the operative facts and whether they are undisputed.

First, it is not at all clear, as Dustin argues, that it is undisputed that damages sought by Young relate to "Owner-initiated changes." (In relying on §2(c) of the Subcontract – which is not addressed to Owner-initiated changes – the Circuit Court did not need to determine whether it was undisputed that changes were Owner-initiated because that question was not material to its decision.) Dustin argues that there is no dispute that Young's claim is based on Owner-initiated changes, pointing to select quotations from Change Requests 1066 and 1067.[20]

---

[20] In affirming the Circuit Court, the Court of Special Appeals accepted Dustin's argument in this regard. For the reasons set forth in the text, we do not.

However, the Subcontract explicitly states "Nothing said or written in the prosecution or defense of any claim(s) against the Owner shall constitute or be regarded as an admission or declaration against interest of either party in any litigation or arbitration between Contractor and Subcontractor." Subcontract, §27(g). The parties clearly contemplated a situation where the Owner (George Mason) would refuse to pay for certain costs and where the Contractor (Dustin) and Subcontractor (Young) must litigate who bears those costs. Neither party apparently wanted to make what was said in a change request to the Owner binding in future litigation between the Contractor and Subcontractor. Thus, placing conclusive weight on a statement made in a change request to resolve litigation between the Contractor and Subcontractor, particularly on a motion for summary judgment prior to discovery, appears to be contrary to the intent of the parties.

Moreover, in the context of a motion for summary judgment, a court must view the evidence in a light most favorable to the non-moving party. *Mathews,* 435 Md. at 598. "Even where the underlying facts are undisputed, if the undisputed facts are susceptible of more than one permissible factual inference, the choice between those inferences should not be made as a matter of law, and summary judgment should not be granted." *Heat & Power Corp. v. Air Prod. & Chemicals, Inc.*, 320 Md. 584, 591 (1990). The gravamen of Young's complaint states that "[d]elays arose through no fault or negligence" of its own, and that "Dustin breached [its subcontract with Young] by failing to coordinate and sequence the work" and "not paying the costs of the extended period of contract performance." Read in context, Change Requests 1066 and 1067 support this theory and do not necessarily seek payment for Owner-initiated changes.

34

For example, read in the light most favorable to Young, Change Request 1066 is asking for reimbursement due to the contract running behind schedule. Although this delay is *associated* with the changes George Mason made, it could also be that Dustin failed to implement those changes efficiently. The two are not necessarily mutually exclusive, and this record is not sufficient to say that Young agrees that Dustin did not contribute to the delays.

Second, as the Court of Special Appeals recognized, §13(c) and §27(f) of the Subcontract, when considered on their own terms, are somewhat similar to the payment provision at issue in *Dyer*. They could thus be construed as pay-when-paid provisions that relate to the timing of payments and that do not relieve Dustin of liability to Young, even if George Mason declines to pay Dustin. 231 Md. App. at 364-65.[21] The intermediate appellate court noted that there is "no timeframe" set forth for Dustin's payment and "no apparent shift in the credit risk." *Id*. at 365. These were the same reasons that the Virginia Supreme Court found the contract provision at issue in *Galloway* to have a latent ambiguity. *Galloway*, 464 S.E.2d at 355. If the parties are unable to identify other language in the Subcontract (apart supplanting them with §2(c)) that indicates that these provisions should be construed as either a pay-when-paid or a pay-if-paid clause, a court could find them to be latently ambiguous. Under *Galloway*, consideration of parol evidence concerning the parties' intentions may thus be necessary to discern whether these

---

[21] *See also Richard F. Kline, Inc. v. Shook Excavating & Hauling, Inc*., 165 Md. App. 262, 274 (2005).

provisions were intended to operate as risk-shifting pay-if-paid clauses.[22]   No such

evidence has yet been submitted by either party.

For these reasons, the Circuit Court did not lack discretion to deny summary

judgment on the ground actually advanced by Dustin.  Accordingly, we decline to affirm

its decision based on that alternative ground.

### III

### Conclusion

We hold that the Circuit Court erred as a matter of law when it applied §2(c) of the

Subcontract and §37(a)(1) of the standard conditions incorporated in the Prime Contract to

award summary judgment in favor of Dustin.  Section 2(c) is a pay-if-paid clause applicable

to the Subcontract Sum and does not necessarily apply to the costs at issue in this case;

§37(a)(1) incorporates a prompt payment provision of Virginia statutory law and does not

create a condition precedent for payment of subcontractors.

We decline to affirm the Circuit Court's decision on alternative grounds.  Whether

§13(c) or §27(f) of the Subcontract function as pay-if-paid clauses is a matter of Virginia

law on which a court may be required to consider parol evidence.  No discovery has been

---

[22] In its opposition to summary judgment, Young argued that, even if §13(c) and §27(f) of the Subcontract were pay-if-paid clauses, the prevention doctrine would negate the effect of such a clause.  Under the prevention doctrine, a general contractor that materially contributes to the failure of a condition precedent under the contract may not rely on the absence of the condition precedent as a defense in a breach of contract action. *See Aarow Equipment & Services, Inc., v. Travelers Cas. & Surety Co.*, 417 Fed. Appx. 366, 372 (4th Cir. 2011).  Given our disposition of this appeal, we need not resolve that issue in this case and decline to speculate on how any facts relevant to that issue will be developed on remand.

36

conducted in this litigation and it is not at all clear on the existing record that there are no material facts in dispute, particularly when the record is viewed in the light most favorable to the non-moving party. Accordingly, we shall remand this case to the trial court for further factual development.

To the extent that there may be issues of Virginia contract law that remain at issue after fuller factual development in the Circuit Court that are deemed worthy of appeal or that meet the criteria for a writ of *certiorari* – *i.e.*, issues for which a resolution is "desirable and in the public interest"[23] – we, or the Court of Special Appeals, have the option of certifying a question of Virginia law to the Virginia Supreme Court for an authoritative resolution.[24]

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED AND CASE REMANDED WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY RESPONDENT.**

---

[23] Maryland Code, Courts & Judicial Proceedings Article, §12-203.

[24] Maryland Code, Courts & Judicial Proceedings Article, §12-601 *et seq.*